663 N.W.2d 225 (2003)
2003 SD 56
In the Interest of T.A., Child, and concerning A.L. Mother, and J.L. Stepfather, Respondents.
No. 22517.
Supreme Court of South Dakota.
Argued March 26, 2003.
Decided May 14, 2003.
*228 George F. Johnson of Johnson, Eklund, Nicholson & Peterson, Gregory, for appellants A.L. & J.L.
Lawrence E. Long, Attorney General, Kirsten E. Jasper, Assistant Attorney General, Pierre, for appellee State.
Anita L. Fuoss, Murdo, for appellee child.
SABERS, Justice.
[¶ 1.] A petition alleging abuse and neglect of T.A. was filed on October 10, 2001 and T.A. was removed from his home and placed in foster care. After an adjudicatory hearing, T.A. was adjudged abused and neglected. After a dispositional hearing, T.A. was placed in a residential facility where he attended school and received therapy.[1] J.L., T.A.'s stepfather and A.L., T.A.'s mother (collectively Parents) appeal the trial court's determination that T.A. was abused and neglected.

FACTS
[¶ 2.] At the time of the events in question, T.A. was twelve years old. He is a special needs child who has been diagnosed with Tourette's Syndrome and Attention Deficit/Hyperactivity Disorder (ADHD).[2] On October 6, 2001, T.A. and his family were moving into a new home which was located approximately fifty feet from their former home. T.A.'s mother and stepfather testified that throughout the day he was disrespectful and defiant, refusing to assist the family in the move. Toward the end of the day, T.A. was asked repeatedly by his mother to go to the old house and retrieve the trashcan. When he finally complied, he did so by emptying the trash onto the kitchen floor of the old *229 house and tossing the trashcan onto the floor of the new house. His step-sister came to the new house and informed Parents that he had thrown the garbage on the floor. Stepfather testified that T.A. vehemently denied having done so and began crying and screaming. T.A.'s stepfather determined that the child was "out of control" so he took him by the wrist, led him to T.A.'s bedroom and proceeded to spank T.A. with a belt. Stepfather testified that he spanked the child eight to ten times with the belt.
[¶ 3.] Several days later, T.A.'s sister saw a large bruise on his thigh and reported it to his biological father, who reported it to the authorities. On October 9, 2001, agents from the Department of Social Services (DSS) and the Sheriff's office went to T.A.'s school to speak with him. The existence of the bruise was confirmed and T.A. was taken to a physician's assistant, Diane Kranz, who found bruises on T.A.'s shins, thigh, posterior, his belt line and his arms. T.A. told Kranz that his stepfather caused some of the bruises and others were caused when he fell running across his yard at night.
[¶ 4.] A petition alleging abuse and neglect was filed on October 10, 2001. The adjudicatory hearing was held on November 14 and 19, 2001 and January 18, 2002. The trial court filed the adjudication order on July 1, 2002. A dispositional hearing was held July 19, 2002 and a dispositional order was entered on August 20, 2002. The Parents appeal raising six issues for review:
1. Whether there is sufficient evidence to sustain the trial court's finding of abuse and neglect.
2. Whether the trial court improperly joined the adjudicatory and dispositional hearings.
3. Whether the trial court abused its discretion in allowing Diane Kranz, the physician's assistant, to testify as an expert.
4. Whether the trial court abused its discretion in admitting pictures of T.A.
5. Whether SDCL 26-8A-2 is unconstitutional.
6. Whether the trial court abused its discretion in allowing an amendment of the abuse and neglect petition.
We affirm the trial court on all issues.

STANDARD OF REVIEW
[¶ 5.] In reviewing abuse and neglect findings by the trial court, it is our duty to "uphold the trial court's decision unless the findings of fact are `clearly erroneous'." Interest of D.K., 245 N.W.2d 644, 649 (S.D.1976) (citing Matter of D.T., 89 S.D. 590, 237 N.W.2d 166 (S.D.1975); In re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455 (1970)). Therefore, the trial court's decision will be set aside only if after a review of all the evidence, we are left with a "definite and firm conviction that a mistake has been made." Matter of A.M., 292 N.W.2d 103, 105 (S.D.1980) (citations omitted).
[¶ 6.] 1. WHETHER THERE IS SUFFICIENT EVIDENCE TO SUSTAIN THE TRIAL COURT'S FINDING OF ABUSE AND NEGLECT.
[¶ 7.] Parents contend that the evidence presented at the adjudicatory hearing was insufficient to justify the trial court's finding that T.A. was an abused and neglected child. We review a claim of insufficiency of evidence under the clearly erroneous standard. Matter of J.A.H., 502 N.W.2d 120, 123 (S.D.1993). Essentially, Parents contend that pursuant to SDCL 22-18-5, Stepfather's spanking with a belt constituted reasonable force used by a parent. SDCL 22-18-5 provides in part:

*230 [t]o use or attempt or offer to use force upon or toward the person of another is not unlawful if committed by a parent... in the exercise of a lawful authority to restrain or correct his child or ward and if restraint or correction has been rendered necessary by the misconduct of such child or ward, or by his refusal to obey the lawful command of such parent ... and the force used is reasonable in manner and moderate in degree.
Based on this statute, Parents argue that the spanking administered by Stepfather was reasonable corporal punishment necessitated by a course of bad behavior by T.A. over the three months prior to October 6. Parents further argue that the trial court concluded that the force used by Stepfather was unreasonable based solely on the fact that Stepfather could not recall precisely how many times he hit T.A. with the belt on the evening in question. Parents argue that the trial court held that it is per se unreasonable for parents to spank unless the parents "keep[]an exact count on the number of spanks." The record does not support these assertions.
[¶ 8.] The proper inquiry under SDCL 22-18-5 is first whether the restraint or correction was "rendered necessary" by T.A.'s action and second whether the force used by Stepfather was "reasonable in manner and moderate in degree." Id. The record supports Parents' assertion that T.A.'s behavior on the day in question was disrespectful and defiant. However, on the day the spanking was administered, Parents failed to intervene in any manner before resorting to spanking. No alternative discipline was attempted prior to the spanking. Furthermore, none of the witnesses in the home during this event testified, as Stepfather did, that T.A. was screaming or crying or otherwise "out of control" prior to the spanking. However, Stepfather contends that screaming and crying were the impetus for the spanking. Because the record does not support Parents' assertion that T.A. was "out of control" or that his behavior necessitated hitting him with a belt, there is no showing of error in the trial court's determination that this punishment was not "rendered necessary" by T.A.'s behavior.
[¶ 9.] There was also no error in the determination that the force used by Stepfather was not "reasonable in manner" or "moderate in degree." This spanking left bruises on T.A. that remained for several days. There were also bruises on the child's arm that Kranz testified were consistent with finger-marks. The bruising on the child was consistent with T.A.'s account of the spanking. Even more significant is the fact that all of the bruising on the child's posterior, belt-line and arm are consistent with Stepfather's account of his own actions during the spanking. Specifically, Stepfather stated that he grabbed T.A.'s arm to take him into the bedroom, that he forced T.A. face-down on the mattress and that he held him there while he spanked him. Stepfather also stated that while spanking T.A., he accidentally hit him too high, resulting in a strike over the belt line and consistent with the bruise discovered by the physician's assistant and DSS. Stepfather claimed that he apologized to T.A. for hitting him too high. Finally, Mother testified that she was aware that Stepfather spanked the child with a belt and that she felt such spanking was permissible, testimony which supports the allegations against Mother that she failed to provide proper parental care by failing to intervene on his behalf.
[¶ 10.] Parents argue that there was insufficient evidence because neither their expert, Dr. Knecht, nor the State's expert, Diane Kranz, could say to a medical degree of certainty what caused the bruises on the child. The record supports the trial court's finding that the majority of bruises were caused by the spanking.
*231 The testimony brought forth at trial supported the child's account of the spanking and both experts testified that at least some of the bruising was consistent with spanking with a belt. Parents argued at the hearing that the bruises on the child were a likely result of the child being a "daredevil" who often fell while attempting bicycle and skate-board stunts. The trial court apparently found this testimony unconvincing and there is clear and convincing evidence in the record to support the child's and State's assertions that the bruises were a result of the spanking.[3]
[¶ 11.] Parents' assertion that there was insufficient evidence to support the finding that T.A. was abused and neglected is not supported by the record. The trial court is affirmed as to this issue.
[¶ 12.] 2. WHETHER THE TRIAL COURT IMPROPERLY JOINED THE ADJUDICATORY AND DISPOSITIONAL HEARINGS.
[¶ 13.] At the adjudicatory hearing, the trial court heard cases-in-chief from the State and Parents. After State and Parents rested, the trial court, over Parents' objection, allowed the attorney for the child to present T.A.'s case. Parents and State were permitted to cross-examine the child's witnesses and at the close of child's case-in-chief, the trial court offered Parents the opportunity for rebuttal. Parents contend that allowing the child's attorney to present a case-in-chief at the adjudicatory phase improperly joined the dispositional and adjudicatory phases of the process and therefore violated the requirement that adjudicatory and dispositional phases be bifurcated.
[¶ 14.] SDCL 26-7A-1 defines "adjudicatory hearing" as:
a hearing to determine whether the allegations of a petition alleging that a child is abused or neglected are supported by clear and convincing evidence[.]
[¶ 15.] "Dispositional hearing" is defined as:

*232 a hearing after adjudication at which the court makes an interim or final decision in the case[.]
SDCL 26-7A-56 provides in part that the rules of civil procedure and evidence apply to adjudicatory hearings but that "all other hearings shall be conducted under rules prescribed by the court." The rules prescribed by the court in other hearings "may be designed by the court to inform the court fully of the exact status of the child and to ascertain the history, environment and the past and present physical, mental and moral condition of the child and the child's parents ... as may be necessary or appropriate to enable the court to determine suitable disposition of the child[.]" SDCL 26-7A-56.
[¶ 16.] This Court has interpreted these and other statutes pertaining to dispositional and adjudicatory hearings to mean that in most cases, these proceedings should be bifurcated. See e.g. Interest of P.M., 299 N.W.2d 803, 806 (S.D. 1980) (stating, "[i]n most cases, the distinctions between adjudicatory and dispositional hearings are important, and a failure to keep those distinctions in mind can cause the wrong issues to be litigated in the adjudicatory hearing"). Furthermore, the court is required to enter separate findings of fact and conclusions of law for each phase of the process. Matter of J.L.H., 299 N.W.2d 812, 814 (SD 1980). This is because the adjudicatory hearing looks to the past, e.g. whether there has been abuse or neglect, while the dispositional hearing looks to the child's future. In the Matter of S.H., 337 N.W.2d 179, 181 (S.D.1983) (citing Interest of P.M., 299 N.W.2d at 806). The focus of the adjudicatory hearing is to determine whether the allegations in the petition alleging abuse and neglect are supported by clear and convincing evidence. SDCL 26-7A-1(2). The focus of the dispositional hearing is the best interest of the child. Matter of S.H., 337 N.W.2d at 181.
[¶ 17.] In this case, the adjudicatory hearing was held on November 14, 2001, continued to November 19, 2001 and completed on January 18, 2002. The dispositional hearing was held on July 19, 2002. There were two separate hearings for each phase of the process, and the findings of fact and conclusions of law for the adjudicatory hearing were filed prior to the dispositional hearing. However, Parents contend that by allowing child to present a case-in-chief at the adjudicatory hearing after the State and Parents rested, the trial court allowed dispositional evidence at the adjudicatory hearing, thus ignoring the statutory requirement of bifurcation. We disagree. These hearings were properly bifurcated, and the evidence allowed by the trial court during the adjudicatory hearing was permissible.
[¶ 18.] The South Dakota Code is clear that the trial court must appoint an attorney for any child alleged to be abused or neglected. SDCL 26-8A-18. Once appointed, we assume that the attorney will work zealously to protect the interests of the child. Accepting Parents' assertion that the child should have been prevented from presenting evidence at the adjudicatory hearing would mean that the child's interests are not presented to the court unless the child is found abused or neglected and a dispositional hearing is held. We do not agree with this result. The child's interests should be protected throughout the proceedings and the child's attorney is specifically charged with that duty. Furthermore, SDCL 15-14-2 provides, "[i]f several parties, having separate interests, appear by different counsel, the court must determine their relative order in the evidence and argument." As noted above, rules of civil procedure apply to adjudicatory hearings. SDCL 15-14-2 is a discretionary *233 rule of civil procedure under which the trial court was entitled to allow the child's attorney to proceed after the State and Parents concluded their cases-in-chief. It was not error to permit the child's attorney to present evidence at the adjudicatory hearing.
[¶ 19.] Having held that the child's attorney is entitled to present evidence at the adjudicatory phase, it must be determined what type of evidence may be admitted. SDCL 26-7A-56 mandates that the rules of civil procedure apply to an adjudicatory hearing. SDCL 26-7A-83 expands the scope of permissible evidence at an adjudicatory hearing to include "information relating to the child's mental, physical and social history" and "circumstances then affecting the child." Therefore, information pertaining to the child's life in and out of the home prior to the adjudicatory hearing is permissible. Furthermore, evidence relating to the current status of the child is also permissible as "circumstances then affecting the child."
[¶ 20.] The majority of the testimony provided by the child's witnesses was introduced in response to the Parents' consistent and overriding assertion that T.A. was out of control and that the only way to regain control was to hit him with a belt. That testimony was provided by various adults in child's life who stated that corporal punishment was not necessary to control his behavior. Those testifying included T.A.'s special education teacher, his foster father, his maternal grandparents and his caseworker from DSS. All of these witnesses testified regarding T.A.'s behavioral problems, his behavior both during and before his placement in foster care and his attitude toward his parents. They also testified that they had never needed to resort to physical punishment in order to control T.A.'s behavior.
[¶ 21.] This testimony was all in direct response to Parents' case-in-chief. The record reveals that Parents' primary arguments were that 1) the child's behavior was often uncontrollable; 2) the "only person in earth" who could keep the child's behavior in check was Stepfather and 3) the only way Stepfather could control the child was if he was entitled to spank him with the belt. Parents invited testimony regarding whether the child could be controlled without belt spanking by raising SDCL 22-18-5, the corporal punishment statute, and T.A.'s behavior as justification for the spanking. Parents have failed to show error in the trial court's decision to allow this evidence.
[¶ 22.] 3. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING DIANE KRANZ, THE PHYSICIAN'S ASSISTANT, TO TESTIFY AS AN EXPERT.
[¶ 23.] After DSS took T.A. into custody, his caseworker took him to be examined by Diane Kranz, a physician's assistant. Kranz viewed the bruising on T.A.'s body, took pictures and discussed the bruises with him. Kranz was the only medical person to view the bruises within days of the spanking. The State called Kranz to testify about the bruising and her opinions regarding the cause of the bruises. Parents objected to her qualification as an expert because she was not a physician and because she performed no tests to determine the cause of the bruising.
[¶ 24.] The trial court retains "broad discretion in ruling on the admissibility of expert opinions. [] We will not reverse a court's evidentiary rulings absent a clear abuse of discretion." Garland v. Rossknecht, 2001 SD 42, ¶ 9, 624 N.W.2d 700, 702 (internal and additional citations *234 omitted). The trial court did not abuse its discretion in allowing Kranz's testimony.
[¶ 25.] Parents' first objection to admission of Kranz's testimony was that the State failed to lay a foundation establishing her as an expert. On voir dire, Parents' attorney established that as a physician's assistant, Kranz was required to be supervised by a doctor because the doctor was the medical expert. This voir dire, Parents contend, established that Kranz was not an expert.[4] The arguments offered in support of this assertion are: 1) that Kranz admitted on voir dire that she was not an expert in the medical field, and 2) that because she is not a doctor she cannot be qualified as an expert. Neither assertion stands in light of our rules of evidence on the admissibility of expert testimony.
[¶ 26.] The opinion of the witness regarding her own expertise is not controlling. The court must determine whether the witness will be considered an expert, and will make that determination independent of what the witness believes about his or her expertise. This witness was the only medically trained person to see the child within days of the spanking. Furthermore, SDCL 19-15-2 provides that a person "qualified as an expert by knowledge, skill, experience, training, or education may testify ... in the form of an opinion or otherwise." In other words, there is no requirement that the person actually be a doctor in order to be qualified to give a medical opinion. The trial court need only determine "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Estate of Dokken, 2000 SD 9, ¶ 40, 604 N.W.2d 487, 498 (citations omitted). These determinations were made by the trial court and there was no showing of abuse of discretion.
[¶ 27.] Parents next contend that under Daubert and Kumho, Kranz's opinions should have been stricken from the record because she performed no tests in arriving at her opinions. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Parents' argument misapprehends the applicability of these cases. This Court has stated that Daubert and its progeny "offer general guides for courts to consider in assessing reliability: testing, peer review, error rate and general acceptance[.] These factors cannot be applied in all settings. In some instances, reliability must focus on `knowledge and experience'." Garland, 2001 SD 42, ¶ 11, 624 N.W.2d at 703 (internal citations omitted). Parents would have this Court create a requirement that the medical profession devise a test to determine how and why a child bruises in order for a medical professional to testify as to whether the child's injuries are consistent with abuse. To our knowledge, there is no such test available and it strains common sense to create such a requirement. Kranz testified that in addition to her licensure as a *235 physician's assistant, she had also worked as a nurse. She was involved in numerous child protection cases and was familiar with blunt trauma injuries. This was sufficient to qualify Kranz to testify as an expert in the instant case and Daubert does not require more.
[¶ 28.] The trial court was entitled to accept or disregard the opinions of both experts in this case. Parents' expert was a medical doctor rather than a physician's assistant. However, he never examined the child, and testified only as to his opinion based on photographs of the bruises. His own testimony gives sufficient justification for rejection of his opinions. Specifically, he was testifying as to his opinion of how the bruises were caused based on pictures that he repeatedly stated were of poor quality. There is no showing that the trial court abused its discretion on this issue.
[¶ 29.] 4. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING PICTURES OF T.A.
[¶ 30.] Parents argue that the trial court abused its discretion in allowing the State to introduce pictures of T.A.'s bruises into evidence. Parents contend that they made several written requests for the pictures but did not get the pictures in time for their expert to view them before he testified. Relying on SDCL 26-7A-60,[5] Parents argue that the State violated discovery rules and should have been prevented from entering the pictures into evidence.
[¶ 31.] SDCL 26-7A-73 provides in part that when a party fails to comply with discovery, the court "may order the party to permit the discovery or inspection, grant a continuance or prohibit the party from introducing evidence not disclosed or the court may enter another order that the court considers just under the circumstances." The trial court denied Parents' motion to exclude the pictures. Parents argue this was an abuse of discretion because they were prevented from having their expert view the pictures before he testified. They contend this was prejudicial because the State's expert, who, due to scheduling difficulties, testified after Parents' expert, relied on the pictures for her testimony, and Parents' expert was unable to counter her testimony because he had no opportunity to view the pictures before he testified.
[¶ 32.] The record does not support Parents' assertion that the pictures should have been excluded. First, Parents' attorney viewed the pictures prior to the hearing and the record provides no evidence that the State's Attorney prevented Parents' access to the pictures. Second, although Parents' attorney wrote letters to the State's Attorney regarding the pictures, there was no motion to compel production of the pictures, although a motion to compel is not mandatory. Third, SDCL 26-7A-73 gives the court discretion to determine whether and how to sanction parties for failure to comply with discovery, and refusal to admit the evidence is only one possible option. Parents were offered a continuance, which they declined. Finally, Parents recalled their expert to attempt *236 to rebut Kranz's testimony therefore eliminating any claimed prejudice resulting from the delay in receiving the pictures. There is no showing that the trial court abused its discretion in denying the Parents' motion to exclude the pictures.
[¶ 33.] 5. WHETHER SDCL 26-8A-2 IS UNCONSTITUTIONAL.
[¶ 34.] Parents argue that South Dakota's child abuse statute, SDCL 26-8A-2 is unconstitutionally broad, vague and ambiguous. Parents acknowledge that the predecessor statute to SDCL 26-8A-2 has withstood several attacks on its constitutionality, but argue that this is the first case "with facts and circumstances that do not immediately and automatically lend themselves to a finding of abuse." This Court has consistently upheld the constitutionality of South Dakota's child abuse statute. Parents' assertion that the facts of this case call its constitutionality into clear question for the first time presumes that this Court declared the statute constitutional based only on the specific facts of the previous cases. This is not supported by our precedent. We have held that the predecessor to this statute "convey[ed] sufficiently definite warning as to proscribed conduct when measured by common understanding and practice. Due process requires no more." Matter of D.T., 89 S.D. 590, 596, 237 N.W.2d 166, 169 (1975) (citing U.S. v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877). The fact that Parents' actions in this case are arguably less egregious than those of parents in prior cases does nothing to lessen the viability of our previous holdings concerning constitutionality. A reasonable person would be aware that forcing a child face down on a mattress, grabbing the child's arm tight enough to leave bruises and beating him hard enough with a belt to leave bruises constitutes abuse rather than reasonable corporal punishment.
[¶ 35.] 6. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING AN AMENDMENT OF THE ABUSE AND NEGLECT PETITION.
[¶ 36.] On the day of the adjudicatory hearing, the State amended the abuse and neglect petition. One amendment added the allegation that the child had been subjected to repeated spankings over several months.[6] The amendment also added to the original allegation that the spanking of October 6 resulted in bruises along T.A.'s belt-line, the bottom of his buttocks, his right hip, thigh and other bruises on his arms and wrist. The original petition named only the bruise on his right hip. Parents argue that allowing the State to proceed on the amended petition was abuse of discretion.
[¶ 37.] The State made no motion to amend but rather stated before the court that "I thought it was necessary to amend the petition, and so I amended it, and immediately faxed a copy to [the other attorneys]." Parents objected to the amended petition, but the trial court overruled the objection noting that leave to amend should be freely given when justice requires. See SDCL 15-6-15(a). The trial court then offered Parents a continuance in order to prepare to better meet the amended petition. After discussion with their attorney, Parents declined the offer of a continuance.
[¶ 38.] We have held that a "trial court may permit the amendment of pleadings *237 before, during and after trial without the adverse party's consent." Tesch v. Tesch, 399 N.W.2d 880, 882 (S.D.1987) (citations omitted). The court's decision to allow an amendment will not be disturbed on appeal unless there is a clear abuse of discretion which results in prejudice to the non-moving party. Id. Parents allege that they were prejudiced by the amendment because the amendments "cured errors and inadequacies which were the basis for [Parents'] motions in limine" filed prior to the adjudicatory hearing. The amendments did address issues which Parents raised in their motions in limine, and having already raised those issues, they were presumably prepared to make those arguments again and were neither surprised nor prejudiced. Furthermore, Parents were offered the opportunity to continue the hearing and although they now claim they were surprised by the changes in the petition, they declined the opportunity. Finally, SDCL 26-7A-6 provides that courts are to construe rules liberally for the purpose of protecting the children. The State is required to file the original petition of abuse and neglect within forty eight hours of the time a child is taken into custody. SDCL 26-7A-14. Therefore, a thorough investigation is seldom complete at the time the original petition is filed. In order to better protect children in abuse and neglect proceedings, trial courts should allow amendment of petitions to conform to the subsequent investigation. Parents have failed to show that allowing the amendments to the original petition was an abuse of discretion.
[¶ 39.] Affirmed.
[¶ 40.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.
NOTES
[1] While this case was pending on appeal, all parties requested a limited remand to allow the trial court to take evidence, and if appropriate, authorize T.A.'s return home. We granted the request. T.A.'s return home does not, however, moot this appeal because Parents are appealing the trial court's finding of child abuse rather than the child's placement.
[2] ADHD and its effects are discussed at length in footnote 3 and the surrounding text in Meldrum v. Novotny, 2002 SD 15, ¶ 40-45, 640 N.W.2d 460, 467-68.
[3] Among the findings the trial court relied on in its determination that the child was abused and neglected were:

1) J.L. admitted that he grabbed T.A.'s arm and forced him over onto the mattress to administer the spanking;
2) J.L. admitted that he held T.A. down and hit him 8 to 10 times with a doubled over belt;
3) J.L. admits that while he was hitting T.A. on the posterior, T.A. tried to squirm away and J.L. hit him on the lower back;
4) During the beating, T.A. was wearing jeans;
5) J.L. testified that when he spanks he continues to hit T.A. until T.A. relaxes and J.L. has control over him again;
6) J.L. told the Deputy Sheriff that on the evening of October 6, T.A. "did get me rather riled";
7) Although Parents testified that they use numerous disciplinary tactics, on the day in question, none other than spanking were utilized;
8) A.L. testified that she knew J.L. was going to hit T.A. with a belt and she approved;
9) A.L. refused to ask J.L. to temporarily leave the house during pendency of the proceedings, forcing foster care placement for the child;
10) Photographs of T.A.'s belt line showed bruising consistent with being hit with a belt;
11) T.A. had bruising on his forearms and wrists that he received while trying to protect himself from the belt;
12) J.L. admits that he did give T.A. a "whipping with the belt" and that he gave T.A. "a pretty good whomp with a belt.";
13) Although he testified he did not believe he left bruises with the spanking, J.L. admitted that he could have because he was "sure putting it on him good enough to get back in control of the situation."
[4] The exchange between Parents' counsel and Kranz was as follows:

Q: You are a P.A., correct?
A: Yes, I am.
Q: That means you are an assistant to a doctor?
A: Yes.
Q: And that means that the doctor has to supervise your work?
A: Yes he does.
Q: And the doctor supervises your work because he is an expert in the medical field?
A: Yes.
Q: And you have somebody supervise your work because you are not an expert in the medical field?
A: Yes.
[5] SDCL 26-7A-60 provides:

On the written request of a respondent or a child, the State's Attorney shall permit the respondent or child to inspect and copy or photograph books, papers, documents, photographs... which are in the possession, custody or control of the State's Attorney and which are material to the preparation of the respondent's or child's case, which are intended for use by the State's Attorney as evidence in chief at the hearing, or which were obtained from or belong to the respondent or child.
[6] This allegation was dismissed at the close of the State's case because the State failed to prove the previous spankings occurred.