2005 SD 126

**The PEOPLE of the State of South Dakota in the Interest of C.F., Minor Child,**

and

**Concerning M.P. and C.S., Respondents.**

No. 23504.

Supreme Court of South Dakota.

Considered on Briefs Sept. 28, 2005.

Decided Dec. 28, 2005.

Lawrence E. Long, Attorney General, Kirsten E. Jasper, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee State of South Dakota.

Jeff Burns of Churchill, Manolis, Freeman, Kludt, Shelton & Burns Huron, South Dakota, Attorneys for appellant Mother M.P.

GILBERTSON, Chief Justice.

[¶ 1.] Mother appeals adjudication of minor child C.F. as abused and neglected. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] C.F. is the eldest of three daughters born to Mother. Mother is married to Stepfather, the biological father of the youngest daughter. At the time of the events in question, C.F. was ten years old.

[¶ 3.] The family's history with the Department of Social Services (Department) began in November 2003. The Department received a referral from the children's school that there were bruises on C.F.'s younger sister (hereinafter "Sister 1.") Sister 1 and C.F. told a Department social worker that Sister 1 had gotten a "whooping" from Stepfather for bad grades and unfinished homework. The children described a "whooping" as more serious than a spanking or a beating, and that it was administered with a belt. The children described that they were required to put their hands on the bed during a "whooping" so they would remain in one spot, and then they would receive the "whooping" on their buttocks. However, in the November 2003 incident, Sister 1 had moved and was struck on the back of her upper thigh with the belt, which left a six-inch bruise.

[¶ 4.] That same day the social worker visited with both Mother and Stepfather regarding the incident. The couple stated they believed in and used "whoopings" with a belt as a form of discipline of last resort. They also stated they punished the children by requiring them to stand in a corner on one leg for a specified period of time. After the conference with the social worker, Mother and Stepfather signed a proposed family case plan in which they agreed to attend Common Sense Parenting classes on administering appropriate discipline. The parents also agreed that they would refrain from verbally chastising the children for visiting with the Department social worker, and discontinue the use of the one-legged corner punishment. The family was also referred to Home Base Services for additional information on nonphysical discipline methods. All three children were removed from the home temporarily, and an abuse and neglect petition was filed. The children were returned to the home and the petition was dismissed after the case plan was signed by the parents.

[¶ 5.] The family's next contact with the Department occurred after a series of events involving C.F. In June 2004, C.F. stole a music CD from a local K–Mart. C.F. lied about stealing the CD. Mother disciplined C.F. by making her return the CD to the store manager, and placing her on two weeks restriction, or grounding. The grounding consisted of the loss of her toys, television viewing, candy and other treats maintained in the home, and outside privileges. The only activity C.F. was allowed to participate in during the summer was swimming lessons. After the two weeks, C.F.'s original grounding was extended when she failed to come home before dark. During the time of the grounding, Mother discovered candy wrappers, and popsicle sticks and wrappers under C.F.'s bed and on the floor of a closet in her room. When confronted by Mother about breaking the rules, C.F. denied it. C.F.'s grounding was extended for several weeks as a result. During the last week of July, Mother discovered green marker scribbles on the carpet and walls of C.F.'s room. Mother and Stepfather asked C.F. to clean the marks and provided C.F. with a cleaning solution in a spray bottle and rag to scrub the carpet.

[¶ 6.] On August 2, 2004, Stepfather entered C.F.'s bedroom and found the markings had not been cleaned and additional candy and popsicle wrappers under C.F.'s bed. Stepfather again requested that C.F. clean up the markings and C.F. began to cry and deny the accusations

against her. Stepfather told C.F. to be quiet and stop crying or he would add to her punishment. C.F. did not quiet down and Stepfather added one day to her restriction, and then a second day when C.F. refused to quiet down. Finally, Stepfather took C.F.'s swimming lessons away after a third warning. Stepfather then left the room and asked C.F. to clean the marks on the carpet and walls, pick up the wrappers and stop crying and screaming.

[¶ 7.] Mother allowed C.F. five minutes to calm herself. When C.F. failed to quiet down, Mother determined C.F. would be spanked. Mother went to her bedroom, got her belt, went upstairs to the child's room and told C.F. to place her hands on the bed. C.F. complied, and Mother administered two "licks" on C.F.'s bottom. C.F. continued to cry and started to scream, so Mother continued to give C.F. "licks" with the belt. Mother stopped after roughly six strikes. When Mother left the room, C.F. was sniffling, and cleaning up the room as requested.

[¶ 8.] C.F. left the home soon after, and ran to the Department's offices in Huron. Social worker Jamie Garrels heard crying and saw C.F. run by his office toward the corner of the hallway by the social workers' offices. Garrels approached C.F. and noted she appeared to have been crying and asked for help. Garrels asked C.F. for her name and to tell him what was wrong. C.F. told Garrels she was afraid to go home because she was going to be beaten by her Stepfather because she had run away from home after her Mother hit her with a belt.

[¶ 9.] Garrels took C.F. to the office of his supervisor, Barb Blaedorn, to examine C.F. for bruises or marks from the spanking. Blaedorn noted C.F. was crying and she sat down in a guarded manner as if her buttocks were sore. Blaedorn examined C.F. within thirty to forty-five min-

utes after the spanking, but could not determine if bruising had occurred due to the dark color of C.F.'s skin.

[¶ 10.] Stepfather arrived at the Department shortly thereafter, and came into Garrels' office and related the story of the theft of the CD from K–Mart. Stepfather stated C.F. had run away from home because she was being punished for stealing. Stepfather also told Garrels that C.F. had run to the Department's offices in Huron in June of 2004, claiming she was afraid to go home for fear of being beaten. Garrels accompanied Stepfather back to the home to talk with Mother, who admitted she had spanked the child with a belt approximately six times.

[¶ 11.] Blaedorn spoke with Mother over the telephone later that day. Mother admitted to hitting C.F. with a belt approximately six times. Mother also stated she did not think the spanking was abusive as it left no marks on the child. Based on the information given to the Department by C.F. and the confirmation by Stepfather and Mother of the details leading up to the incident and the spanking, C.F. was removed from the home. At the Department's request, C.F. was examined by a physician the following day but no bruising was detected.

[¶ 12.] On August 2, 2004, the trial court issued a temporary custody directive placing C.F. in the care and custody of the Department. The State filed an abuse and neglect petition on August 4, 2004, alleging Mother abused and neglected C.F. An adjudicatory hearing was held on October 5, 2004.

[¶ 13.] Mother argued at the adjudicatory hearing that her actions were rendered necessary by C.F.'s misbehavior, and that the amount of force she used was reasonable in manner and moderate in degree within the meaning of SDCL 22–18–

5.[1] Mother argued that there was no other alternative available for C.F.'s series of misbehaviors, and that because there was nothing else to take from the child the spanking was necessary. In addition, Mother quantified the amount of force she used as a four on a scale of one to ten. Mother noted she used a belt to administer corporal punishment rather than her hand, as she and Stepfather believe that parents' hands should be used for affection and not punishment.

[¶ 14.] While Mother was testifying, the trial court inquired into a past incident the family had while living in Tennessee involving corporal punishment.[2] Mother testified that she had spanked one of her children on her hand. A staff member of the state of Tennessee's equivalent to the department of social services had investigated the matter. Mother testified that she told the staff member that when she was a school age child, Tennessee law permitted corporal punishment to be administered at school using a paddle or little strap to hit a child on the hand. Mother testified that the staff member informed her that the law had changed, and that hitting a child on the hand was no longer permitted. Instead, Mother testified she was informed that the law permitted the administration of corporal punishment by spanking a child's rear end.

[¶ 15.] The trial court found C.F. to be abused and neglected within the meaning of SDCL 26–8A–2 based on Mother striking C.F. six times with a belt to her buttocks as punishment for C.F.'s failure to remove coloring marks from the wall or floor, concealment of candy and ice cream wrappers, and crying and slamming doors after being informed that she would not be allowed to participate in swimming lessons. The trial court held that Mother's act of striking C.F. six times with a belt for the above-mentioned misbehavior was not reasonable in manner and moderate in degree as set forth in SDCL 22–18–5. On November 8, 2004, the trial court signed an order of adjudication and interim disposition and entered adjudicatory findings of fact and conclusions of law. The final dispositional hearing was held on November 30, 2004, at which the trial court returned physical and legal custody of C.F. to Mother. The final dispositional findings of fact and conclusions of law and the final dispositional order were served on December 15, 2004.

[¶ 16.] Mother appeals one issue: Whether the trial court abused its discretion when it determined C.F. was an abused and neglected child.

### STANDARD OF REVIEW

[¶ 17.] Whether a child is abused and neglected is a question of fact that the State must prove by clear and convincing evidence. *In re D.T.*, 2003 SD 88, ¶ 5, 667 N.W.2d 694, 697. The trial court's findings of fact are subject to the clearly erroneous standard, and will not be set aside unless "we are left with a definite and firm conviction that a mistake has been made." *In re J.S.B., Jr.*, 2005 SD 3,

---

1. SDCL 22–18–5 provides in relevant part:
   To use or attempt or offer to use force upon or toward the person of another is not unlawful if committed by a parent ... in the exercise of a lawful authority to restrain or correct his child or ward and if restraint or correction has been rendered necessary by the misconduct of such child or ward, or by his refusal to obey the lawful command of such parent, ... and the force used is reasonable in manner and moderate in degree.

2. The subject of the incident was raised during the testimony of a Department social worker. The social worker testified she had contacted a social worker in Memphis, Tennessee, concerning an incident involving the family.

¶ 12, 691 N.W.2d 611, 615 (citing *In re T.H.*, 396 N.W.2d 145, 148 (S.D.1986)). We will give due regard to the trial court's opportunity to judge the credibility of witnesses. *Matter of D.H.*, 354 N.W.2d 185, 188 (S.D.1984)(quoting *Matter of S.L.*, 349 N.W.2d 428, 432 (S.D.1984)).

## ANALYSIS AND DECISION

■ [¶ 18.] The State must prove a child is abused or neglected under the criteria set forth in SDCL 26–8A–2.[3] *Matter of S.L.*, 419 N.W.2d 689, 693 (S.D.1988). "Under SDCL 26–8–6, any one of the eight subparts to that statute standing alone is enough to sustain a dependency and neglect adjudication as long as that ultimate finding is supported by clear and convincing evidence." *Id.*

[¶ 19.] This Court has crafted a two-prong inquiry to assess whether a parents' administration of corporal punishment falls under SDCL 22–18–5 and, therefore, is not abuse as defined under SDCL 26–8–6. *In re T.A.*, 2003 SD 56, ¶ 8, 663 N.W.2d 225, 230. The first prong of the inquiry requires the trial court to determine whether the restraint or corrective measure utilized was "rendered necessary" by the child's actions. *Id.* The second prong requires the trial court to determine whether the force used was "reasonable in manner and moderate in degree." *Id.*

[¶ 20.] Mother contends that the evidence presented at the adjudicatory hearing shows her conduct falls within the limits of SDCL 22–18–5, and therefore the State failed to produce sufficient evidence to support a holding that C.F. was an abused and neglected child. Mother argues her actions meet both conditions imposed on the use of force by parents under SDCL 22–18–5.

[¶ 21.] First, Mother argues the spanking was rendered necessary by the misconduct of C.F. over the months of June, July and August of 2004. Mother urges this Court to find the trial court erred when it found that the six strikes were excessive in manner and not moderate in degree for the offense of failing to remove coloring marker from the wall or floor, concealment

---

3. SDCL 26–8A–2 provides:

In this chapter and chapter 26–7A, the term, abused or neglected child, means a child:

(1) Whose parent, guardian, or custodian has abandoned the child or has subjected the child to mistreatment or abuse;

(2) Who lacks proper parental care through the actions or omissions of the child's parent, guardian, or custodian;

(3) Whose environment is injurious to the child's welfare;

(4) Whose parent, guardian, or custodian fails or refuses to provide proper or necessary subsistence, supervision, education, medical care, or any other care necessary for the child's health, guidance, or well-being;

(5) Who is homeless, without proper care, or not domiciled with the child's parent, guardian, or custodian through no fault of the child's parent, guardian, or custodian;

(6) Who is threatened with substantial harm;

(7) Who has sustained emotional harm or mental injury as indicated by an injury to the child's intellectual or psychological capacity evidenced by an observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior, with due regard to the child's culture;

(8) Who is subject to sexual abuse, sexual molestation, or sexual exploitation by the child's parent, guardian, custodian, or any other person responsible for the child's care;

(9) Who was subject to prenatal exposure to abusive use of alcohol or any controlled drug or substance not lawfully prescribed by a practitioner as authorized by chapters 22–42 and 34–20B; or

(10) Whose parent, guardian, or custodian knowingly exposes the child to an environment that is being used for the manufacturing of methamphetamines.

of candy and ice cream wrappers, and crying and slamming doors after being informed that the child would not be allowed to participate in swimming lessons. Instead, Mother urges this Court to view the series of events as one continuous offense or misbehavior for which progressive discipline was rendered necessary. Under the one continuous offense approach, Mother argues that the disciplinary actions were necessary as C.F.'s misbehavior continuously escalated throughout the summer months and culminated in the episode on August 2, 2004.

[¶ 22.] Second, Mother argues that the strikes were reasonable in manner and moderate in degree. Mother contends that the force was not excessive, as the strikes were given on the buttocks and over clothing. Furthermore, Mother argues that the strikes were not intended to cause bruising and, in fact, did not cause bruising. Finally, Mother argues that the strength and severity of the strikes were "probably a 4 on a scale of 1 to 10," and therefore not excessive.

[¶ 23.] The record supports Mother's assertion that C.F.'s behavior on the day in question was disrespectful and defiant, in that C.F. was screaming and crying and slamming doors before the spanking. The trial court noted that C.F.'s behavior had escalated over the summer, and that she had been pushing the issue with her misbehavior. The trial court did not include a finding of fact or conclusion of law concerning the necessity prong of SDCL 22–18–5. However, based on the hearing transcript we conclude that the trial court determined that the punishment was rendered necessary within the meaning of SDCL 22–18–5 by C.F.'s misconduct. It is clear from the evidence presented at the hearing that the trial court did not err in its conclusion that Mother was exercising lawful authority to correct the child.

[¶ 24.] However, on the day of the spanking, the trial court found that Mother failed to intervene in a manner that permitted her to administer punishment starting from the lower end of the scale, rather than starting at the upper end of the scale that had been established over the course of the summer. While alternative discipline was attempted by Stepfather, Mother did not attempt any other form of discipline before administering the six strikes with a belt. The trial court found that Mother overdid the punishment in that hitting the child six times with a belt was not moderate in degree and reasonable in manner given the facts of the case, such that the amount of force used complied with the second prong of the test for corporal punishment under SDCL 22–18–5. The trial court noted that there were other forms of punishment that Mother could have resorted to rather than starting at the punishment of last resort on the day in question.

[¶ 25.] The Legislature has determined in this State that corporal punishment will not be absolutely prohibited, nor will it be allowed in all instances with any amount of force a parent decides to use. Instead the Legislature has opted for a middle ground by requiring it be "rendered necessary" and be "reasonable in manner and moderate in degree," in order for such corporal punishment to fall outside the definition of abuse under SDCL 26–8–6.

[¶ 26.] These requirements are obviously very general in nature, and by their very terms place a large amount of discretion with the trial court to determine whether or not the actions of a parent fall within the definition in SDCL 22–18–5. Such a definition further calls for such a determination by the trial court on a case by case basis. There obviously is no bright line test applicable under a statutory definition such as this. As such, defer-

ence for the trial court and its ability to hear the evidence and determine the appropriateness, or lack thereof, of the parents actions is considerable.

[¶ 27.] There was no error in the determination by the trial court that the amount of force used by Mother was not "reasonable in manner and moderate in degree." While the spanking left no bruises on C.F., it did leave her with enough pain that she sat down in a guarded manner at the Department's office some thirty to forty-five minutes after the strikes were administered. Despite Mother's assertions that the force of the blow was only a "4 on a scale of 1 to 10," clearly there was enough force behind the blows for the child to experience pain for an extended period of time.

[¶ 28.] Employing the clearly erroneous standard of review to the trial court's findings of fact, we are not "left with a definite and firm conviction that a mistake has been made." *See In re J.S.B., Jr.,* 2005 SD 3, ¶ 12, 691 N.W.2d at 615 (citing *In re T.H.,* 396 N.W.2d at 148.) Therefore, the trial court did not err in finding the amount of force used by Mother was not "reasonable in manner and moderate in degree." We affirm the trial court's holding that C.F. was abused and neglected.

[¶ 29.] SABERS and KONENKAMP, Justices, concur.

[¶ 30.] ZINTER, Justice, concurs with a writing.

[¶ 31.] MEIERHENRY, Justice, concurs specially.

ZINTER, Justice (concurring).

[¶ 32.] I concur and write to add the fact that the trial court expressly found this punishment was not reasonable in manner and moderate in degree because:

1) Mother had painted herself into a corner; 2) there were other alternatives; and 3) Mother "overdid it." There was also evidence, which was not objected to, reflecting a problematic history with corporal punishment. Considering all of the evidence, the trial court's factual findings were not clearly erroneous.

MEIERHENRY, Justice (concurring specially).

[¶ 33.] In this case, we affirm an abuse and neglect determination based on a parent's use of a belt to spank a child. The case of *In re T.A.* also affirmed a determination of abuse and neglect where a father spanked his child with a belt. 2003 SD 56, ¶¶ 2–11, 663 N.W.2d 225, 228–31. In that case, the spanking was unacceptable because the "[p]arents failed to intervene in any manner before resorting to spanking" and because no alternative discipline was attempted prior to the spanking. *Id.* ¶ 8. We also said that the evidence did not support the father's claim that T.A. was "out of control." *Id.* In addition, the spanking left bruising "on the child's posterior, belt-line and arm." *Id.* ¶ 9. Under the circumstances, the force was not reasonable in manner and moderate in degree under SDCL 22–18–5. *Id.*

[¶ 34.] This case, however, presents a different situation. Here, the child's misbehavior leading up to the spanking started when she stole a music CD from a store. Mother required her to return the CD and apologize to the storeowners. Mother also grounded C.F. with loss of toys, television, candy, and treats. The child broke the rules by returning late from swimming and eating candy and popsicles. Additionally, the child scribbled on the carpet and walls of her room with a green marker. As a result, the child was directed to clean the markings and pick up the candy wrappers and other trash she

had left on the floor of her closet and behind her bed. Failing to do so, she was admonished by her stepfather. According to Mother, the child's crying and screaming and slamming doors got louder and louder. Mother testified, "C.F. was up there about five minutes or so, she was still screaming and slamming doors and I had had enough. There was nothing else to take from her. I had taken everything she had." Mother saw the child's behavior "as the final straw. There was no talking. Nothing else to take away and her behavior was way beyond unacceptable." Mother said she got a belt, went to the child's room and told the child to turn around and put her hands on the bed. She then spanked the child over her clothing with the belt six times, with a force of four on a scale of one to ten. Mother admitted to administering spankings like this about four times a year. The trial court found that under the circumstances hitting a child six or seven times with a belt was not reasonable in manner and moderate in degree and that Mother had overdone it.

[¶ 35.] In this case, the parents tried other methods of discipline before the spanking. Evidence indicated the child was out of control—screaming, crying and slamming doors. And despite the spanking administered by Mother, the child showed no bruising. What appears to be unacceptable in this case is that Mother used a belt and hit the child six or seven times with a force that did not leave bruises but made the child uncomfortable. This is certainly a very restricted interpretation of the legal force a parent can use under South Dakota law "in the exercise of a lawful authority to restrain or correct his child ... if restraint or correction has been rendered necessary by the misconduct of such child ... or by his refusal to obey the lawful command of such parent." SDCL 22–18–5. Apparently the use of a belt and the number of swats rendered the spanking of C.F. abusive, that is, not "reasonable in manner and moderate in degree." This restricted interpretation could be a very slippery slope for the trial courts. Spanking is out of favor under modern theories of child rearing, yet the Legislature still recognizes the parent's right to enforce physical punishment. Thus, resolution of these conflicting theories is left to the individual judge on a case-by-case basis and indubitably does not give clear direction to parents who might be hauled into court on abuse and neglect claims.

[¶ 36.] That being said, our standard of review on appeal is whether the trial court's findings are clearly erroneous. Those findings are not to be set aside unless we are definitely and firmly convinced that the trial court made a mistake. Under this standard of review, I agree this matter should be affirmed.