2001 SD 105

**The PEOPLE of the State of South Dakota in the Interest of S.G.V.E. and A.G.V.E., Minor Children, and Concerning G.G.V.E., Respondent.**

**No. 21839.**

Supreme Court of South Dakota.

Considered on Briefs July 26, 2001.

Decided Aug. 15, 2001.

Mark Barnett, Attorney General, Ann M. Holzhauser, Assistant Attorney General, Pierre, for appellee State of South Dakota.

Nancy Manning, Rapid City, for appellant G.G.V.E., Mother.

John Murphy, Rapid City, SD, Attorney for appellees S.G.V.E. and A.G.V.E., Children.

PER CURIAM.

[¶ 1.] Mother, an enrolled member in the Oglala Sioux Tribe, appeals from the termination order involving her daughters, raising jurisdictional issues and questions regarding least restrictive alternative and the children's best interests. The Indian Child Welfare Act (ICWA) applies to this case. We affirm.

### FACTS AND PROCEDURE

[¶ 2.] A.G.V.E., the eldest daughter, and S.G.V.E., the youngest daughter, were born June 30, 1989, and August 22, 1990, respectively, and are presently ages 12 and 10. They moved with Mother from the Pine Ridge Indian Reservation to Rapid City on October 7, 1999. Until then, they lived on the reservation. On October 18, the Rapid City police and a Department of Social Services (DSS) worker responded to a report of domestic violence at Mother's residence. They found two intoxicated adults (Mother's sister and her boyfriend) and three children present. It was learned that three adults and five children lived in the home, though Mother told her landlord two adults and two children would be living there. The only furniture within was a single air mattress. The only food found was milk, ketchup and two frozen breakfast burritos. There were no plates, silverware or cooking utensils. The only other items found in the home were a sack of empty beer cans and an empty liquor bottle. The children had not attended school that day and had head lice. Mother arrived home at this time, intoxicated, with the children, and was arrested for nonsupport. The children were taken into DSS temporary custody and an abuse and neglect petition was filed October 22, 1999.

[¶ 3.] Mother is an alcoholic. In January 1997, the Oglala Sioux Tribe removed her children from her care due to problems related to her drinking and the abuse and neglect of her children. DSS began working with Mother on the Pine Ridge Indian Reservation at this time. The tribe returned the children to Mother's custody sixteen months later, in May 1998, after Mother completed alcohol treatment. Mother has had periods of sobriety as well as relapses into alcohol use. Mother began drinking again shortly after her children were returned to her.

[¶ 4.] Mother has also involved herself with men who are violent and who have physically abused her. She has been involved with three such men during the children's lifetimes.

[¶ 5.] After the abuse and neglect petition was filed October 22, 1999, notice was

sent by certified mail to the Oglala Nation Tiospaye Resource and Advocacy Center (ONTRAC), the Oglala Sioux Tribal Court, the Aberdeen Area Director of the Bureau of Indian Affairs, and the Secretary of the Interior. This mail was received and signed for by individuals within these agencies on October 27, 1999, October 27, 1999, October 28, 1999 and October 29, 1999, respectively. Notices of subsequent hearings in this matter were also sent by certified mail and signed receipts in the record indicate receipt by these four agencies.[1]

[¶ 6.] On November 12, 1999, DSS met with Mother and they signed a Family Service Agreement (FSA) which required that Mother: 1) visit her children weekly; 2) obtain a chemical dependency evaluation and follow its recommendations; 3) complete a parenting course; 4) obtain a domestic violence evaluation and follow its recommendations; and 5) obtain suitable housing. An updated FSA, requiring a psychological evaluation requested by Mother's attorney, was signed January 3, 2000.

[¶ 7.] Mother was arrested and jailed in Pine Ridge for an outstanding warrant involving child neglect and open intoxication. Her advisory hearing, scheduled for November 9, 1999, was continued due to her incarceration. At the February 7, 2000 advisory hearing, Mother appeared with her attorney and admitted the allegations in the abuse and neglect petition. Mother was court-ordered to cooperate with DSS and warned by the court that she had nine months to "straighten her act

out" or her parental rights would be terminated.

[¶ 8.] DSS attempted to locate family and tribal member placements for the children. Father was contacted in this regard.[2] Ultimately, his parental rights were terminated August 9, 2000; this decision was not appealed.

[¶ 9.] Mother did not complete the requirements of her FSA. She lived in motels and did not obtain suitable housing. DSS was unaware of her whereabouts at various times during the pendency of these proceedings. She failed to obtain employment and missed appointments and some visits with her children. Mother was admonished and warned again by the trial court at an April 3, 2000 review hearing. She failed to keep her appointment for the scheduled psychological evaluation and did not complete this requirement. Mother obtained a chemical dependency evaluation and was recommended to complete an intensive outpatient treatment program, attend two Alcoholics Anonymous (AA) meetings weekly and seek a sponsor, and follow aftercare recommendations. Mother did not follow these recommendations. She admitted drinking in January or February of 2000 and was dropped from her aftercare program for non-attendance. She attended AA meetings in June and July 2000 only after the trial court ordered her to do so. She completed a domestic violence evaluation after a delay of several months and rescheduling, but failed to attend the recommended support group meetings though she was also court-ordered to do so. At a June 27, 2000 review hearing, when it became clear that Mother

---

1. The State notified ONTRAC, the Oglala Sioux Tribe's ICWA compliance office, by certified mail that was signed for as received, nine different times regarding various proceedings in this action. Each of the other agencies, except for the Secretary of the Inte-

rior, was also notified nine times. The Secretary of the Interior received seven notices.

2. Mother informed DSS that she and Father have an older child, not part of this appeal, who lives with Father on the reservation.

had not made an effort to obtain suitable housing and showed little motivation toward completing other FSA requirements, the court again issued stern warnings to Mother to attend to these tasks.

[¶ 10.] Mother, according to her attorney and as evidenced by the record, "passively resisted" all attempts by DSS to assist her in addressing the problems which caused her to lose custody of her children. This resulted in her attorney's request to amend the FSA to require a psychological evaluation of Mother. As indicated, she failed to keep her appointment and never obtained this evaluation. Her missed visits with her children caused them to write her letters, included in the record, expressing their hurt and anger and refusing to accept fault for her lack of responsibility.

[¶ 11.] In August 2000, Mother moved back to the Pine Ridge Indian Reservation and lived with her father. She would later testify she moved back in an attempt to use ICWA to keep from having her parental rights terminated. On August 24, Mother told her younger daughter that she met someone and was getting married. Older daughter expressed concern to a DSS worker that Mother's new boyfriend would beat Mother. Despite assuring her children she would not marry until they were living with her on the reservation, Mother married her new boyfriend in September of 2000. Mother admitted this was "quick" and that she often focuses more on the men in her life and places her children "last instead of first." The children do not know Mother's new husband. Efforts by DSS to get Mother and children admitted into an inpatient treatment program on the reservation were rejected by Mother in part because it would require her to be away from her new husband.

[¶ 12.] Mother's parental rights were terminated at a final dispositional hearing

October 13, 2000. Her request for a continuance was denied. Following filing of this order, Mother's attorney advised the court that Mother's filed objections to the State's proposed findings of fact and conclusions of law had included jurisdictional issues. An evidentiary hearing on those issues was scheduled for December 21, 2000 and the October 13, 2000 order was vacated for the limited purpose of determining the jurisdiction of the Oglala Sioux Tribe.

[¶ 13.] The tribe filed a motion to transfer jurisdiction and dismiss the case on December 20. It prayed the state court would give full faith and credit to the tribal court's December 18, 2000 order accepting jurisdiction of the matter. This motion was filed under the concurrent jurisdiction provision of § 1911(b) of ICWA but the state court permitted oral amendment of the motion to be filed under the exclusive jurisdiction provision of § 1911(a) of ICWA.

[¶ 14.] At the December 21 evidentiary hearing, the state court determined the tribe did not have exclusive jurisdiction. The court further determined that although the tribal court had concurrent jurisdiction, good cause was shown for denying its motion to transfer due to the advanced stage of the proceedings at which the tribe made its request.

[¶ 15.] On January 16, 2001, the court filed its final dispositional order and findings of fact and conclusions of law which denied the tribe's motion to transfer and reinstated the court's previous order terminating Mother's parental rights. Mother appeals.

## ANALYSIS AND DECISION

[¶ 16.] **1. Whether the trial court erred in finding that the Oglala Sioux**

**Tribe did not have exclusive jurisdiction of this matter.**

[¶ 17.] Section 1911(a) of ICWA provides that the tribe has exclusive jurisdiction if: 1) the Indian child resides on the reservation; 2) the Indian child is domiciled on the reservation; or 3) the Indian child is a ward of the tribal court. Mother asserts jurisdiction based on the second and third provisions of this section.

## A. Domicile

[¶ 18.] In *In re G.R.F.*, 1997 SD 112, 569 N.W.2d 29, we held that jurisdiction under ICWA is established as of the date the action is filed. *Id.* at ¶ 19, 569 N.W.2d at 34 (citing *Spear v. McDermott*, 121 N.M. 609, 916 P.2d 228, 234 (N.M.Ct. App.1996)); *see also In re Adoption of Halloway*, 732 P.2d 962, 966 (Utah 1986) ("The propriety of the trial court's assumption of jurisdiction turns on [the child's] domicile at the time these proceedings were initiated."). In the present case, the significant date is October 22, 1999, the date the abuse and neglect petition was filed.[3] On this date, Mother and children were living in Rapid City.

[¶ 19.] The United States Supreme Court has held, in a case applying ICWA, that "domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S.Ct. 1597, 1608, 104 L.Ed.2d 29, 46 (1989). "Since most minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents." *Id.*, 490 U.S. at 46, 109 S.Ct. at 1607, 104 L.Ed.2d 29.

[¶ 20.] Physical presence is established in Rapid City. The following evidence was presented as to Mother's state of mind concerning her intent to remain in Rapid City with her children: Mother vacated her residence on the reservation on October 7 and moved to Rapid City, leasing a residence there; Mother enrolled the children in the Rapid City school system; Mother transferred her food stamp/TANF case to Rapid City and informed her caseworker she did not have to complete community service requirements on the reservation because she had moved to Rapid City; and in November, Mother moved her remaining personal belongings to Rapid City. She testified her intent in moving was to see if the children would receive a better education in Rapid City. There is no indication by Mother's actions or statements of an intent that the move was temporary.

[¶ 21.] Although Mother cites to the number of years she lived on the reservation prior to her October 7, 1999 move to Rapid City, the fact remains that she did move, leaving her reservation residence and giving no indication of an intent to return.

## B. Wards of the tribal court

[¶ 22.] Although she testified to the contrary at the December 2000 evidentiary hearing, Mother claims on appeal that her children remained wards of the tribal court following that court's return of her children to her in May 1998. The tribal court's order dated May 7, 1998 was a trial exhibit and is part of the settled record of this case. In no way does it appear to be anything other than a final order, returning custody to Mother, finding her home is no longer contrary to the best interests of the children, and releasing DSS from service and ordering that the case be closed. There is no reference

---

**3.** The result is the same if we determine the effective date to be October 19, 1999, the date the order granting temporary custody to DSS was entered.

to continuing jurisdiction over these children. This order stands in contrast to the temporary custody order of a tribal court we examined in *In re D.L.L.*, 291 N.W.2d 278, 282 (S.D.1980) and held to be a continuing order. Mother's reliance on that case is misplaced.

[¶ 23.] As the children were not wards of the tribal court and were not domiciled on the reservation at the time these proceedings were initiated, the state trial court did not err in finding that the tribal court did not have exclusive jurisdiction.

[¶ 24.] **2. Whether the trial court abused its discretion in denying the Oglala Sioux Tribe's motion to transfer jurisdiction to the tribe.**

[¶ 25.] The trial court found that although there was concurrent jurisdiction between the state and tribal courts, there was good cause to deny the tribe's motion to transfer jurisdiction to the tribe because of the advanced stage of the proceedings at the time the tribe filed its motion. By this date, December 20, 2000, the case had already been pending for fourteen months *and Mother's parental rights had actually been terminated for over two months.* The tribe had had notice of these proceedings since the beginning of this case, in October 1999. No explanation was offered in its motion to transfer to explain why it waited until this case had been disposed of by final order before requesting the transfer.

[¶ 26.] In *In re A.L.*, 442 N.W.2d 233 (S.D.1989), we quoted BIA guidelines on the issue of what constituted good cause not to transfer, noting that ICWA does not provide a statutory definition of "good cause:"

Good cause not to transfer the proceeding may exist if any of the following circumstances exists:

(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

44 FedReg at 67591. The timeliness of a petition language is 'designed to encourage the prompt exercise of the right to petition for transfer in order to avoid unnecessary delays.' *Id.* at 236. "The legislative history of the ICWA states that the term was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.* at 235 (citing SRep No.597, 95th Cong., 1stSess. 17 (1977)).

[¶ 27.] In *A.L.*, we held that notice by certified mail to the tribe constituted substantial compliance with ICWA notice requirements and that the tribe had actual notice one year before it requested transfer.[4] We held the transfer request in that case was untimely. In *In re Wayne R.N.*, 107 N.M. 341, 757 P.2d 1333 (N.M.Ct.App. 1988), cited in *A.L.*, a motion for transfer filed six months after notice was received by the tribe, and on the morning of the hearing to determine parental rights, was held to be untimely. "[W]hether a petition is timely must be made on a case-by-case basis." *A.L.*, 442 N.W.2d at 236. In neither of these cases had the action proceeded to the stage in this case, the entering of a final dispositional order by the court.

[¶ 28.] The trial court did not abuse its discretion in denying, for good cause, to transfer this matter to the tribal court where the motion to transfer was filed fourteen months after the tribe received notice and over two months after a final dispositional order had been entered terminating Mother's parental rights.

4. Here, too, the notice requirement of ICWA was met by the tribe's having actual notice through certified mail, though there is no evidence it received registered notice.

[¶ 29.] **3. Whether the trial court erred in finding beyond a reasonable doubt that serious emotional or physical damage would likely result if the children were returned to Mother.**

[¶ 30.] During the pendency of these proceedings, the children were placed in five different foster homes due to their behaviors.[5] The younger child cries easily and has frequent tantrums. She has a stealing problem and admitted to having two imaginary friends she can call upon whenever she wants. The older daughter is intolerant of others, refuses to apologize for anything, and tries to get others in trouble. One foster parent noted she does not seem to have an emotional connection with anyone and relationships are only superficial. Both girls have had hurtful arguments with one another and have disowned each other as sisters, deciding they do not wish to live together.

[¶ 31.] Psychological evaluations on both children were completed and they were found to have serious psychological symptoms and were diagnosed with major depression. These symptoms and diagnoses were determined to be consistent with an impoverished early childhood. The younger daughter, harbors a "very negative, angry attitude toward the environment" while the older daughter is detached and represses her emotions. Both conditions were considered chronic and significantly impacted the girls' psychological functioning. Testimony was presented that both children would benefit from a stable environment. As the conditions which led to their removal continued to exist due to Mother's failure to complete FSA requirements and put her children's interests ahead of her own, the trial court did not err in finding beyond a reasonable doubt that serious emotional or physical damage would likely result if the children were returned to Mother.

[¶ 32.] **4. Whether the trial court erred in finding beyond a reasonable doubt that termination of Mother's parental rights was the least restrictive alternative and in the children's best interests.**

[¶ 33.] We have always recognized that the needs of the children are paramount and that their best interests must prevail. *In re A.H.*, 421 N.W.2d 71 (S.D. 1988); *In re R.Z.F.*, 284 N.W.2d 879 (S.D. 1979). Mother had fourteen months to put her children's best interests first. She admitted at the final dispositional hearing that she often put their needs last. She demonstrated this a month before the court terminated her parental rights by marrying a man her children did not know after promising them she would wait until they were together again. She did not tell DSS she was married. She did not comply with the requirements of her FSA despite the court's repeated warnings, admonitions and orders to do so. In short, there is no indication that the situation existing at the time the children were removed from Mother's custody had been alleviated or that Mother was interested in making the permanent changes necessary for her children to be returned.

[¶ 34.] The termination order is affirmed.

[¶ 35.] MILLER, Chief Justice, and SABERS, AMUNDSON, KONENKAMP and GILBERTSON, Justices, participating.

---

**5.** One of these moves was an administrative decision by DSS and not due to the girls' behaviors.