661 N.W.2d 768 (2003)
2003 SD 49
In the Interest of D.M., R.M., III, and T.B.C., Minor Children and Concerning R.M., Jr. and S.B.C.-M., Parents and Respondents.
In the Interest of B.B.C., Minor Child, and Concerning L.M.L. and S.B.C.-M., Parents and Respondents.
Nos. 22563, 22564, 22565.
Supreme Court of South Dakota.
Considered on Briefs April 16, 2003.
Decided April 30, 2003.
Rehearing Granted June 9, 2003.
*770 Lawrence E. Long, Attorney General, Ann M. Holzhauser, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee State of South Dakota.
Patrick M. Ginsbach of Farrell, Farrell & Ginsbach, Hot Springs, South Dakota, Attorneys for appellant S.B.C.-M.
Lynn A. Moran, Custer, South Dakota, Attorney for appellant R.M., Jr.
PER CURIAM.
[¶ 1.] This is an appeal regarding the termination of parental rights concerning four minor children. The children are Native American and the provisions of the Indian Child Welfare Act (ICWA) are applicable.

FACTS
[¶ 2.] S.B.C.-M. (Mother) is the maternal parent of B.B.C., D.M., R.M. and T.B.C. R.M. (Father) is the paternal parent of three of the children; D.M., R.M. and T.B.C. Father and Mother were married but are now divorced. L.M.L. is the paternal parent of B.B.C. L.M.L. did not participate in the proceeding below and does not appeal the termination of his parental rights. At the time this proceeding commenced, B.B.C. was age eleven; D.M. was age three; R.M was age two and T.B.C. was age eight months.
[¶ 3.] On January 1, 2001, Mother was transported by ambulance to the emergency room after she was found unconscious in her home. It was determined Mother may have suffered a seizure that evening. Mother had previously undergone surgery in 1999 for a brain aneurysm and was medicating for pain stemming from her condition. As a result of that surgery mother suffers physical effects including short term memory loss, speech problems, slight paralysis in the left arm, severe headaches and seizures on occasion.
[¶ 4.] Earlier that evening Father arrived at Mother's apartment intoxicated. Mother left with Father and contacted a niece to care for the children. Mother believed that she was going to experience a seizure that day. Mother later returned to the apartment "very, very drunk" and was angry. She accidentally hit one of the children in the nose causing him to bleed. Mother then took her pain medications and mixed them with beer by pouring the beer into her pill bottle. Mother threw an ashtray at niece and niece left.
[¶ 5.] Mother called her pastor and told him that she was going to commit suicide. *771 Law enforcement responded to the scene after reports of a possible assault. Upon arrival at the scene the officers were informed of the suicide call. Mother was discovered lying unconscious on the floor of the children's bedroom. The children were temporarily placed with the niece until Father sobered up. DSS was informed of the incident.
[¶ 6.] Two days later, DSS received a report of possible abuse and bruising on one of the children. A social worker and law enforcement agent went to Father's residence to conduct a welfare check on the children that morning. Father smelled of alcohol and he admitted he had been drinking. One of the children had been sleeping on a bed with no obstructions to prevent rolling off. Upon investigation, the majority of the bruises turned out to be birth marks except for a bruise on the forehead that occurred when the child fell off the bed. The social worker observed that the children were very dirty and messy. Mother was contacted in the hospital and a decision was made to take the children into protective custody. Mother believed Father was a danger to the children when he was drinking. The concerns at that time were Father's drinking, lack of supervision, appropriateness of care and concerns related to Mother's physical and mental condition.
[¶ 7.] Subsequently, the Department received a report that B.B.C., who was not present on that night, was now in Mother's care. B.B.C. was believed to have been born with fetal alcohol syndrome and was then sent to live with an aunt. He later spent some time in the Black Hills Children's Home. Thereafter, B.B.C. was sent to live with his grandfather until Mother determined he was not properly caring for B.B.C. After verifying B.B.C. was with Mother the social worker encouraged Mother to return him to grandfather's care. She did not. As a result, B.B.C. was removed from Mother's care.
[¶ 8.] Mother and Father were both allowed visitation with the children. Mother filed a motion with the trial court requesting that Father be prohibited from visiting the children when Mother was present and requested Father only be allowed supervised visitation. That request was granted. The trial court also allowed increased and unsupervised visits for Mother. Following an extended visit with Mother, a social worker, upon her arrival at the house, was informed by one of the children Father was hiding in the closet. Father was discovered in his boxer shorts. This violated both the terms of the court's order and the Family Service Agreement (FSA) that Mother signed three days prior.
[¶ 9.] The FSA's in this matter provided that Mother was required to complete and follow a chemical dependency evaluation; attend all meetings of Parents as Teachers; attend all visits with children; attend immediate and ongoing counseling; attend parenting classes and find a suitable adult to live with her and the children to help her parent. This last requirement was instituted after a psychological evaluation was conducted on Mother by Dr. Perrenoud. Dr. Perrenoud recommended that Mother not parent as a single parent due to her medical condition.[1] He stated that she needed a "committed form of skilled social support available to her." This consisted of another competent parental *772 figure living with Mother and the children on a full time basis, providing daily and regular contact.
[¶ 10.] Father's FSA required that he abstain from alcohol and drugs; complete and follow the recommendations of a chemical dependency evaluation; complete parenting classes; attend AA meetings and provide verification; complete an alcohol treatment program and also complete a parenting assessment. Despite these requirements, Father continued to drink and was observed intoxicated on four separate occasions. He was also arrested once for DUI during the pendency of this proceeding. Additionally, he admitted to drinking a case of beer the night before the dispositional hearing.
[¶ 11.] Mother either failed to complete the requirements of her FSA or delayed completion until the latter part of this proceeding. In addition, there was a concern that she had become addicted to her pain medications. Father also had difficulty completing the requirements of his FSA. A psychological evaluation conducted on Father indicated that he suffered from narcissism and had difficulty placing the needs of the children over his own. Father failed to attend his required counseling. Though at certain points Father made improvements toward sobriety, he did have relapses and lost his last job because of his drinking. Though this case spanned nineteen months, it was noted that Mother and Father only progressed to the point normally expected within five to six months. The counselor for the children also expressed concerns over Mother and Father's continued parenting given their difficulties and the special needs of these children.[2] The trial court terminated parental rights. Mother and Father appeal.

ANALYSIS

ISSUE ONE
[¶ 12.] Did the trial court err in denying the motion to transfer jurisdiction to the Rosebud Sioux Tribe?
[¶ 13.] Notice of these proceedings was given to the Rosebud Sioux Tribe (Tribe) and the Tribe filed a notice of intervention on January 26, 2001. The Tribe moved to intervene on August 9, 2001. The motion to intervene was granted August 10, 2001. On July 29, 2002, a month after the commencement of the dispositional proceedings and nearly one-year after the tribe moved to intervene, the Tribe filed a motion to transfer and the tribal court entered an order indicating it would accept the transfer.[3]
[¶ 14.] On July 31, 2002, the trial court indicated that it would consider the motion at a later hearing and directed counsel to prepare memoranda on that issue. At that hearing, no representative for the Tribe appeared. The trial court then determined:
Now I don't think it is necessary to take any testimony in this matter, and I think it's simply a matter of looking in the record in this matter to determine that the proceedings here were in advanced stage when the petition to transfer was received, and that of course was one of the exceptions or what's called good cause for not making the transfer. I am certainly not making the transfer at this time in this case based upon that reason.
*773 There was no request by counsel to present witnesses or introduce further evidence on this issue.
[¶ 15.] "Transfer to the jurisdiction of the tribe is mandatory in the absence of good cause to the contrary." In re M.C., 504 N.W.2d 598, 601 (S.D.1993). This Court recently determined that good cause existed not to transfer a case when the tribe had notice of the proceedings but the case had already been pending for fourteen months before the tribe filed its motion to transfer. In re S.G.V.E., 2001 SD 105, ¶ 28, 634 N.W.2d 88, 93. In that case, the final disposition phase had already been entered and an order issued before the motion to transfer was made. Id. Therefore, this Court determined that good cause existed for denying the transfer based on the timing of the motion. Id. It was not an abuse of discretion for the trial court to deny the transfer. Id. See also In re Wayne R.N., 107 N.M. 341, 757 P.2d 1333 (holding petition to transfer untimely when received on the morning of the hearing). That reasoning is applicable here.
[¶ 16.] The parties were presented with an opportunity to argue their positions on this issue to the trial court. There is nothing in the record to indicate that any further evidentiary hearings were even requested. The record demonstrates that the trial court considered the factors establishing good cause and determined that this matter was at an advanced stage of the proceeding. This is an explicit exception to the transfer requirement. See In re M.C., 504 N.W.2d at 601. The dispositional phase was already in progress when the motion was made. On these facts, the trial court did not err in denying the transfer.

ISSUE TWO
[¶ 17.] Did the trial court abuse its discretion in determining the State's expert witness was qualified under ICWA?
[¶ 18.] ICWA provides:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 USC § 1912(f). Parents contend that expert testimony, of the caliber mandated by ICWA, was lacking in this case.
[¶ 19.] Qualification of experts and admission of their testimony are matters that fall within the trial court's sound discretion. In re J.L.H., 316 N.W.2d 650, 651 (S.D.1982). A trial court's rulings in this area will be disturbed on appeal only if its discretion was clearly abused. In re J.L.H., 316 N.W.2d at 651.
[¶ 20.] Pauli-Tarrell's testimony revealed that she possessed the following qualifications: she managed the child protection program for five counties in South Dakota, including an area encompassing the Pine Ridge Indian Reservation; she had been employed by DSS for approximately fifteen years; she had prior experience in handling delinquent youth; she worked with tribal court and tribal agencies; she worked with Native American clients of the child protection program; she had attended several trainings relating to issues of family violence and child services for Native American families; she had attended trainings on ICWA and had previously been qualified as an ICWA expert. Based on these qualifications, the trial court did not abuse its discretion in determining the witness was a qualified expert under ICWA.

*774 ISSUE THREE
[¶ 21.] Did the trial court err in finding the requirements of ICWA were met before terminating parental rights?

A. Active Efforts
[¶ 22.] ICWA requires the State to show that it made efforts to prevent the breakup of the Indian family. In this regard, ICWA provides:
Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
25 USC § 1912(d).
[¶ 23.] With regard to this requirement, the record demonstrates that DSS engaged in "active efforts" designed to prevent the break-up of this Indian family. Though we do not reiterate them all here again, the facts, as previously set forth, demonstrate that DSS offered a wide range of services to these parents and attempted to work toward reunification of the family over a considerable period of time. That the efforts were not successful does not mean they were not made.

B. Continued Custody Would Likely Result In Serious Emotional Or Physical Damage To The Children.
[¶ 24.] [C]hild custody proceedings involving the termination of parental rights to an Indian child are subject to specific minimum federal procedures and standards. ICWA provides:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 USC § 1912(f). Thus, the burden of proof that must be shown is "evidence beyond a reasonable doubt." Id.
[¶ 25.] The trial court found beyond a reasonable doubt that serious emotional or physical harm to the children would result from continued custody with parents. The trial court entered the following findings beyond a reasonable doubt:
1. Father has a chronic history of alcoholism.
2. Father's rehabilitation would be a long-term effort with significant probability that it would not be successful.
3. Father received a DUI during the pendency of this proceeding and drank the night before the dispositional hearing.
4. Father failed to complete inpatient treatment as required.
5. Father has failed to consistently attend aftercare.
6. Father lost his last job and apartment as a result of his drinking.
7. Father failed to provide proof of AA attendance as ordered.
8. Father has not enrolled in individual counseling.
9. Father has cancelled or not shown for 27 visits with his children.
10. Mother has not completed the Community Transitions program.
11. Mother has failed to obtain individual counseling as required by her chemical dependency evaluation.
12. Mother has failed to participate and meet with Parents as Teachers.
13. Mother has not identified anyone, other than Father, to be a support *775 to her as a parent, a requirement recognized by both the State's and her own witness.
14. Mother has failed to complete parenting classes.
15. Mother has failed to maintain a level of consistency with her medication and has gone to the emergency room on a number of occasions.
16. Mother has failed to appear for 30 visits with her children.
These findings are amply supported by the record and not clearly erroneous. Based on these findings, the trial court did not err in determining continued custody is likely to result in serious emotional or physical damage beyond a reasonable doubt.

ISSUE FOUR
[¶ 26.] Did the trial court err in determining termination was the least restrictive alternative in the best interests of the children.
[¶ 27.] Mother contends that the least restrictive alternative would be allowing her continued custody with supervision by DSS. We have always recognized that the needs of the children are paramount and that their best interests must prevail. In re A.H., 421 N.W.2d 71, 75 (S.D.1988). Parental rights may be terminated if it is in the best interests of the children and is also the least restrictive alternative available. SDCL 26-8A-26. The best interests of the children are viewed from the children's, not the parents', perspective. In re E.D.J., 499 N.W.2d 130, 135 (S.D.1993).
[¶ 28.] The parents assert that they have made tremendous strides which support the imposition of other alternatives in lieu of termination. The trial court's findings, however, contradict that assessment. These children are desperately in need of safety, certainty and stability in their lives. The parents did not reach a point where they could adequately provide for the children during the nineteen months this matter was pending and it is uncertain if they ever will. Further delay in the search for permanency is not in the best interests of these children.
[¶ 29.] Affirmed.
[¶ 30.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, participating.
NOTES
[1] Dr. Perrenoud was not the only doctor recommending this. Dr. Mulder from the Pine Ridge Indian Health Services also opined "In my limited opinion I do not believe [Mother] is capable of child-care and child protection in emergencies." Mother's own witness, Dr. Simpson, also recognized this as an essential requirement. Mother's pastor also acknowledged a need for assistance.
[2] The children all suffer from traits associated with reactive attachment disorder. B.B.C. also suffers from attention deficit disorder and a learning disability.
[3] The dispositional hearings were conducted on four occasions. Father was absent twice, Mother was absent once.