2005 SD 86

**The PEOPLE of the State of South Dakota in the Interest of O.S., Child(ren), and concerning S.E.H., Appellant,**

**and**

**M.S., Interested Party.**

**No. 23420.**

Supreme Court of South Dakota.

Considered on Briefs May 23, 2005.

Decided July 13, 2005.

Thomas M. Diggins, Pennington County Public Defender's Office, Rapid City, South Dakota, Attorneys for appellant Mother S.E.H.

Lawrence E. Long, Attorney General, Kirsten E. Jasper, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee State of South Dakota.

MEIERHENRY, Justice.

[¶ 1.]  This is an appeal from a Final Dispositional Order terminating Mother's parental rights to her minor child, O.S., a member of the Cheyenne River Sioux Tribe.

## FACTUAL BACKGROUND

[¶ 2.]  The termination of Mother's parental rights to O.S. was ultimately due to her alcoholism. Mother had seven children prior to O.S. and had been involved with social services in another state. Her parental rights to one of the children had been terminated. The other children were being raised by their grandmothers. Mother became aware that she was four months pregnant with O.S. during an involuntary commitment to a detoxification facility. The Department of Social Services (DSS) entered into a case plan with her to address her alcohol dependence. She was placed in an alcohol treatment facility for the remainder of her pregnancy.

[¶ 3.]  She gave birth to O.S., a Native American child, in November of 2002. Fetal Alcohol Effect was suspected but not confirmed. Mother and child remained at the treatment facility until February 2003, when Mother left against the staff's advice. Within three days, Mother relapsed. She then re-entered the facility and remained there until being discharged on April 1, 2003. Within a month after her discharge, she again relapsed. She checked herself back into the detoxification facility, at which time O.S. was removed from her custody. The next several months were fraught with relapses culminating in a petition to terminate Mother's parental rights to O.S.

[¶ 4.] On August 4, 2003, O.S. was adjudicated as an abused and neglected child. The Cheyenne River Sioux Tribe (CRST) intervened on August 11, 2003. *See* 25 U.S.C. § 1911(c). A number of review hearings followed. Throughout this process, the DSS social worker assigned to the case made various efforts to reunite the family, all of which were unsuccessful. A final dispositional hearing to terminate parental rights was held on July 12, 2004.

[¶ 5.] Because of O.S.'s status as a Native American, the Indian Child Welfare Act (ICWA) applied to the proceedings. Pursuant to ICWA, the testimony of a qualified expert witness was required to terminate parental rights. 25 U.S.C. § 1912(f). To meet this requirement the State offered the testimony of Sarah Trimble, who had been a social worker with DSS for over four years. The trial court qualified Trimble as an expert witness over the objection of Mother and CRST. Trimble testified that continued custody of O.S. by Mother would likely result in serious emotional or physical damage to O.S.

[¶ 6.] The Tribe sought to offer testimony from its ICWA expert by telephone. The Tribe's plan to have its expert telephonically testify was not brought before the court until the morning of hearing. The court denied the telephonic testimony because it was untimely offered and because the judge felt it would have been difficult to judge credibility over the telephone. Ultimately, the trial court terminated the parental rights of Mother. Mother appeals and raises three issues.

### ISSUES

I. Whether the trial court erred by qualifying the State's ICWA expert.

II. Whether the trial court erred by refusing to allow the intervening Tribe's proposed ICWA expert witness to appear telephonically at the final disposition hearing.

III. Whether the trial court erred by finding that serious emotional or physical damage would occur if O.S. were returned to the care of Mother.

### STANDARD OF REVIEW

[¶ 7.] In abuse and neglect cases where termination of parental rights is sought, the evidence must establish beyond a reasonable doubt that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *People ex rel. M.H.*, 2005 SD 4, ¶ 10, 691 N.W.2d 622, 624–25 (citing 25 U.S.C. § 1912(f)). The evidence must include the testimony of a qualified expert. *Id.* The standard of review for a trial court's qualification of an expert witness is abuse of discretion. *In re D.M.*, 2003 SD 49, ¶ 19, 661 N.W.2d 768, 773. We recently stated:

We do have firm guidance as to whom shall be expert witnesses in South Dakota: A witness is an expert witness and is qualified to give expert testimony if the judge finds that to perceive, know or understand the matter concerning which the witness is to testify, requires special knowledge, skill, experience or training and that the witness has the requisite special knowledge, skill, experience or training. The qualifications and competency of a witness to give opinion evidence is primarily in the discretion of the trial court and his ruling in determining qualifications will not be disturbed unless there is no evidence that the witness had the qualifications of an expert or the trial court has proceeded upon erroneous legal standards.

*People ex rel. M.H.*, 2005 SD 4, ¶ 10, 691 N.W.2d at 625 (quoting *Matter of K.A.B.E*, 325 N.W.2d 840, 843–44 (S.D.1982)).

[¶ 8.] The underlying task of the expert's testimony in ICWA cases is to provide the court with an understanding of the social and cultural aspects of Native American families and the childrearing practices of the child's tribe. We said:

"This testimony is to provide the court with knowledge of the social and cultural aspects of Indian life to diminish the risk of any cultural bias." *In re L.N.W.*, 457 N.W.2d 17, 18 (Iowa App.1990). . . . "One of the problems the ICWA sought to correct was the failure of welfare workers to understand Indian culture and practices concerning the raising of children." *In re D.S.*, 577 N.E.2d 572, 576 (Ind.1991) (reversing for failure of trial court to inquire into expert witnesses' qualifications relating to placement of Native American Indian children). "[E]xperts should possess more than simply substantial education and experience in the area of their specialty. Rather, they should have expertise in, and substantial knowledge of, Native American families and their childrearing practices." *Matter of K.H. and K.L.E.*, [294 Mont. 466] 981 P.2d [1190] at 1193. Such testimony is a "prerequisite" to the termination of parental rights under ICWA. *Id.*

*Id.* ¶ 11, 691 N.W.2d at 626.

[¶ 9.] The abuse of discretion standard also applies to a trial court's decision regarding telephonic testimony. *See State v. Brown*, 285 N.W.2d 843, 845 (S.D. 1979) ("A trial judge is vested with considerable discretion in regulating the manner of examination of witnesses and his exercise of that discretion will not be disturbed unless it has been abused or substantial

harm has improperly been done to the complaining party."). The trial court's findings of fact are reviewed under the clearly erroneous standard. *In re T.A.*, 2003 SD 56, ¶ 5, 663 N.W.2d 225, 229. "Therefore, the trial court's decision will be set aside only if after a review of all the evidence, we are left with a 'definite and firm conviction that a mistake has been made.'" *Id.* (citing *Matter of A.M.*, 292 N.W.2d 103, 105 (S.D.1980)).

## DECISION

*Qualification of the State's ICWA Expert*

[¶ 10.] Mother contends on appeal that the trial court did not have before it the necessary foundational evidence to qualify the State's witness, Sarah Trimble, as an ICWA expert. Relying on our recent opinion in *People ex rel. M.H.*, 2005 SD 4, 691 N.W.2d 622, Mother claims that Trimble did not exhibit sufficient knowledge of the customs and culture specific to the child's tribe, CRST.[1] Although challenging Trimble's qualifications, Mother does not argue that Trimble lacked an understanding of Native American culture nor that Trimble's description of CRST's childrearing practices was inaccurate. Rather, she argues that the State had not sufficiently established a foundation for Trimble's expertise because Trimble lacked experience with and knowledge of CRST specifically.

[¶ 11.] A trial court's qualification of an expert depends on the foundational evidence presented at trial. We determined in *People ex rel. M.H.* that based on the evidence, the trial court had abused its discretion in qualifying the proposed ex-

---

1. At trial, Mother's objection to the State's expert was a general objection devoid of the specific grounds now advocated on appeal. It should be noted that because *People ex rel. M.H.* was decided several months after the trial in this case, neither the trial court nor the parties had the benefit of our decision. The final dispositional hearing in this case was held on July 12, 2004. *People ex rel. M.H.* was decided on January 5, 2005.

pert. In that case, we emphasized the importance of the expert's foundational knowledge of the child's tribe and its childrearing practices. Specifically, we determined that the expert was unable to "articulate the cultural or religious differences between the tribes he worked with and the CRST," was unable to "identify the Lakota kinship structure or who was primarily responsible for raising the children in that structure" and was "unable to identify any services offered by the CRST." *Id.* ¶ 13, 691 N.W.2d at 626–27. Additionally, the expert's knowledge was called into question by evidence and testimony offered by the tribe disputing the accuracy and reliability of the proposed expert's opinion and the underlying knowledge upon which that opinion was based. *Id.* ¶ 15 n. 7, 691 N.W.2d at 627 n. 7.

[¶ 12.] In contrast, a review of the record in the case before us shows that the State's expert had substantial knowledge of Indian culture and childrearing practices. She had gained the knowledge through a variety of experiences throughout her career. Her experiences included participation in various ICWA training courses, some of which were conducted by Native American persons. She also had extensive experience working with Native American families. Part of the experience with Native American families was gained during the last four years in her employment as a social caseworker for DSS. Half of her cases involved Native Americans. She explained that she worked "with both parents and children on voluntary case management, as well as reunification of children in the home, connecting them up with resources and ensuring that the kids knew about their culture." She testified that this training and experience had made her familiar with the key elements of Native American parenting techniques and childrearing practices, which she described in detail. She also had worked with Na-

tive Americans at two of her previous jobs. One of the jobs was with the Black Hills Workshop, where she worked for four years. As part of her duties at the workshop, she took clients to various powwows, hoop dances and other cultural activities. The other job was with Violence Against Women Incorporated as a sexual assault advocate for over two years. Again, approximately half of her clients were Native Americans. Her duties included supporting and advocating for the clients at the criminal proceedings and also "connect[ing] them up in the community if they wanted to access cultural resources." Most of her work was with the Oglala Sioux Tribes. In addition to the familiarity with Native American culture gained from her work, she was personally familiar with the culture because she had family members who were Native American.

[¶ 13.] In preparation for her testimony in this case, she contacted the child's Tribe to verify that her understanding of Native American childrearing practices was consistent with CRST's practices. Trimble testified that she had contacted the Tribe via telephone and was eventually transferred to someone willing to speak to her about the childrearing practices. She verified from this conversation that CRST's childrearing practices were similar to those with which she was familiar.

[¶ 14.] As we have consistently held, the trial court has discretion in determining the qualifications of an expert witness. Here there was substantial evidence of Trimble's expertise in Native American culture and the childrearing practices of Native Americans. There was also evidence that her understanding of general Native American childrearing practices was in accord with CRST's specific practices. Conversely, there was little evidence before the trial court that ques-

tioned the knowledge and accuracy of Trimble's expertise. Considering the foundation laid by the State and the lack of any specific challenge to this expertise by Mother, the trial court did not abuse its discretion in qualifying the expert.

*Exclusion of Telephonic Testimony*

[¶ 15.] At the final dispositional hearing, the attorney for the Tribe offered the telephonic testimony of its own ICWA expert. The matter of the telephonic appearance was brought before the court for the first time on the morning of the hearing. The trial court refused to allow such an appearance, partly due to the difficulty in judging the credibility of telephonic testimony. Mother asserts that this refusal to allow telephonic testimony was error.

[¶ 16.] Mother cites no authority for the premise that a trial court is required to allow telephonic testimony. She concedes that it was within the trial court's discretion to allow or exclude such testimony. The trial court's responsibility at a dispositional hearing is to "consider evidence regarding proper disposition of the child best serving the interests of the child with due regard to the rights and interests of the child's parents, guardian, custodian, other parties respondent, the public and the state." SDCL 26–7A–90. Evidence at the dispositional phase "may include social study reports, mental and medical examination and evaluation reports, homestudy investigation reports and any other evidence related to appropriate disposition of the child." *Id.* An expert's testimony can also be offered by deposition. SDCL 26–7A–79.

[¶ 17.] Here the trial court's exclusion of the telephonic testimony of the Tribe's proposed expert was based on the untimeliness of the request and the court's legitimate concern over its ability to judge the credibility of the telephonic testimony.[2] Additionally, Mother does not indicate how she was prejudiced by the exclusion. "The trial court has broad discretion to determine the mode and manner of witness' testimony and will be reversed only for abuse of that discretion." *State v. Alidani*, 2000 SD 52, ¶ 17, 609 N.W.2d 152, 157. We cannot say that the trial court abused its discretion by excluding the testimony. *See Byrd v. Nix*, 548 So.2d 1317, 1319–20 (Miss.1989). *See also In re Guardianship/Conservatorship of Van Sickle*, 694 N.W.2d 212, 218 (N.D.2005).

*Serious Emotional or Physical Damage*

[¶ 18.] Under ICWA, the court must make "a determination, supported by evidence beyond a reasonable doubt, including the testimony of a qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 USC § 1912(f). We have determined that the testimony of a qualified expert witness was provided. Mother contends that despite this testimony, the evidence was insufficient to meet the 'beyond a reasonable doubt' burden of proof. She argues that although she does have alcohol abuse problems, the State established no causal relationship between her alcohol abuse and potential emotional and physical damage to the child. Essentially, her argument is that while there is substantial evidence of her alcohol abuse, there is little evidence

---

**2.** The trial court addressed the Tribe's request as follows:

> The first time I heard from you was this morning when you requested a telephonic conference so your expert witness could appear telephonically. Not now or no way by telephone. You're judging credibility of the witness ...., but you can't judge it on the telephone and it's not going to happen telephonically, period.

that her alcohol abuse and resulting behaviors are likely to harm the child.

[¶ 19.] Initially, we emphasize that the evidence shows a very serious long-term alcohol abuse problem.[3] It takes little imagination to foresee the negative consequences such abuse would have in respect to raising a child. More importantly, some of these foreseeable consequences had already manifested. At birth, O.S. showed signs of Fetal Alcohol Effect. There was testimony at the hearing that O.S. was behind developmentally and was very small for his age. There was also testimony that at least once prior to DSS taking custody of the child, Mother, while on an extended drinking binge, had forgotten with whom she had left O.S. Only after checking with numerous friends was Mother able to locate O.S. There was also testimony that Mother had been involved in two verbally and possibly physically aggressive altercations with O.S.'s father in the presence of O.S. Alcohol was involved and police were called to the scene on both occasions. After DSS took custody, Mother's repeated and unsuccessful attempts at rehabilitation resulted in her spending little time with O.S. and caused O.S. to remain in the care of third parties. During these times, Mother would occasionally miss scheduled visitations due to intoxication, and on one occasion she attempted to visit O.S. while intoxicated. The trial court recognized that Mother loved her child but found that her inability to fulfill her role as a parent and guardian made anything less than termination contrary to the child's best interests and likely to result in serious physical or emotional damage to O.S. We cannot with a definite and firm conviction say that the trial court erred.

[¶ 20.] We affirm.

[¶ 21.] GILBERTSON, Chief Justice, and SABERS and KONENKAMP, Justices, concur.

[¶ 22.] ZINTER, Justice, concurs in result.

ZINTER, Justice (concurring in result).

[¶ 23.] I join the Court's opinion on all issues except the ICWA expert witness dispute. I concur in result on that issue because this Court has routinely approved the qualification of ICWA experts with equal or lesser qualifications than those presented in this record. *See Matter of K.A.B.E.*, 325 N.W.2d 840 (S.D.1982)[4]; *In re D.M.*, 2003 SD 49, 661 N.W.2d 768.[5]

---

3. Mother admits to having started drinking at age 15. She is now nearly 40 years old. She has attempted rehabilitation a number of times without success and her frequent relapses are generally severe. She discovered she was pregnant with O.S. only after she had been involuntarily committed to a detoxification facility, at which time her PBT was nearly .40, which, by comparison, would be five times the legal limit for driving.

4. Although the case involved the Lower Brule Sioux Tribe, the extent of the qualifications approved by this Court in *K.A.B.E.*, 325 N.W.2d at 843, consisted only of the following:

The witnesses who testified were a social worker with the South Dakota Department of Social Services and the Director of the Children's Inn in Sioux Falls. The social worker has worked as such for over four years. She has a bachelor of arts degree in social work and has had contact with Indians on a regular basis. The Children's Inn is a shelter and resource center for children and parents involved with child abuse. The Director had a bachelor of science degree in social work and a year towards her master's degree. Approximately 30% of the children utilizing the Children's Inn are Indians.

5. Although the case involved the Rosebud Sioux Tribe, the extent of the qualifications approved by this Court in *D.M.*, 2003 SD 49, ¶ 20, 661 N.W.2d at 773, consisted only of the following:

Therefore, the trial court correctly concluded that this expert met the requirements of ICWA.

[¶ 24.] However, this Court affirms on the basis that the expert met the requirements of *People ex rel. M.H.*, 2005 SD 4, 691 N.W.2d 622. That case imposed a new tribal specificity requirement[6] for qualification as an ICWA expert. Because I disagree with the factual and legal analysis in *M.H.*, I concur in result. *See M.H.*, ¶ 26 *et seq.* (Zinter, J., dissenting).

[¶ 25.] The weakness of *M.H.* is exemplified by this case. The record reflects that this proposed expert had familiarity with Native American culture and childrearing practices, but had no knowledge of the Cheyenne River Sioux Tribe's (CRST's) specific practices. *See supra* at ¶¶ 12–13. However, this Court approves the expert's qualifications on the sole basis that, in preparing to testify, the expert contacted the CRST by telephone and "was eventually transferred to someone willing to speak to her about the childrearing practices" of the CRST. *Supra* ¶ 13. Based upon this one phone call to "someone" confirming that general Native American practices were similar to those of the CRST, the Court concludes that the expert met the new tribal specificity standards of *M.H.*

[¶ 26.] Ironically, this "confirmation of similar practice methodology" was rejected in *M.H.* Moreover, this expert's knowledge of the CRST's specific practices is even less than what was found to be inadequate in *M.H.* The expert in *M.H.* had far more knowledge of specific cultural and childrearing practices based on fourteen years of work with several Tribes' Indian people in the area of child abuse and ICWA and:

> ... through his knowledge of the similarity of childrearing practices among all regional tribes. His particularized knowledge was established through his experience with the Yankton Sioux Tribe and by talking with other experts. From that experience, he was aware of the differences in culture, but the similarity of childrearing practices. More specifically, with respect to culture, [the expert] indicated that he had "some insight, but ... not the particular cultural practices of the Cheyenne River Sioux Tribe." However, he then explained, without contradiction, that the Yankton Sioux Tribe "is culturally, fairly culturally similar to the other eight Sioux tribes in South Dakota and North Dakota and I'm fairly familiar with their cultures." Thus, even under a "particular culture" requirement, there was *some* record evi-

[The proposed expert's] testimony revealed that she possessed the following qualifications: she managed the child protection program for five counties in South Dakota, including an area encompassing the Pine Ridge Indian Reservation; she had been employed by DSS for approximately fifteen years; she had prior experience in handling delinquent youth; she worked with tribal court and tribal agencies; she worked with Native American clients of the child protection program; she had attended several trainings relating to issues of family violence and child services for Native American families; she had attended trainings on ICWA and had previously been qualified as an ICWA expert.

6. It is noteworthy that there is nothing in the text of ICWA that requires specialized knowledge of the child's tribe. The Act merely provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 USCA § 1912(f) (1978).

dence of similarity sufficient to satisfy the abuse of discretion standard of review.

More importantly, even if [the expert] possessed *no* knowledge of cultural differences, an allegation not supported by the record, he unequivocally testified that he did have "specific knowledge of the childrearing practices." [The expert] explained, again without contradiction, that there were not "significant differences in childrearing practices among the nine Sioux Tribes. They have different cultural practices, but the childrearing practices are essentially the same." Consequently, even though [the expert] admitted the four deficiencies noted by this Court, he still possessed specific knowledge of the childrearing practices necessary to assist the court in making a dispositional decision under the ICWA.

*M.H.*, 2005 SD 4, ¶¶ 35–36, 691 N.W.2d at 630–31 (Zinter, J., dissenting).

[¶ 27.] Thus, today's decision adds more confusion to this area of the law. It does so because the disqualified expert in *M.H.* had substantially *more familiarity* with the *specific childrearing practices* of the CRST than the expert qualified in this case. Moreover, although the method of obtaining specific knowledge (by verifying comparative practices with other Tribes) was specifically rejected in *M.H.*, it is approved today. These inconsistencies demonstrate why *M.H.* should be reconsidered. Because *M.H.* was not well grounded in fact or law, I decline to join that portion of today's opinion that applies it.