1997 SD 86

**The PEOPLE of the State of South Dakota in the Interest of B.S. a/k/a B.A.M., Child(ren), and Concerning L.S. and F.M.**

**No. 19630.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 9, 1997.

Decided July 16, 1997.

Anthony E. Crawford, Rapid City, for appellant, F.M., Father.

Mark W. Barnett, Attorney General, Joan P. Baker, Assistant Attorney General, Pierre, for appellee State of South Dakota.

PER CURIAM.

[¶ 1] F.M. (father) appeals the termination of his parental rights over B.A.S., his two and one-half year old son. We affirm in part, reverse in part and remand.

## FACTS

[¶ 2] Father is a thirty-seven-year-old Native American male with a ninth grade education. L.S., (mother) is a twenty-seven-year-old Native American female with a tenth grade education.[1] Father and mother have never been married.

[¶ 3] Mother was raised in an abusive and neglectful family environment and began a long course of substance abuse at age ten.

She began "huffing" inhalants such as rubber cement and spray paint and, later, graduated to alcohol, amphetamines and cocaine. She received substance abuse treatment as an adolescent and, by age fifteen, became pregnant with her first child. The child was adopted when it was only a month old.

[¶ 4] Mother met father while they were both patients at the Human Services Center in 1986. Father was hospitalized for auditory and visual hallucinations resulting from a combination of substance abuse and psychological problems. Father's long history of substance abuse includes both alcohol and marijuana. His psychological problems are aggravated by his substance abuse and he has been hospitalized at the Human Services Center on five occasions over the years. It appears father's problems largely result from an established pattern of discontinuing his medications, continuing his substance abuse and then becoming psychotic.

[¶ 5] Before meeting mother, father had a daughter from another relationship who, apparently, resides with her mother but visits father on occasion. Mother and father's first child was born in 1992, but resides with mother's aunt. It is unclear whether mother and father's parental rights over this child have ever been terminated.

[¶ 6] Mother and father have an established history of domestic violence. They quarrel over matters such as father's substance abuse and become physically violent to the extent of giving each other "black eyes." Both mother and father have been taken to jail over night because of incidents of domestic violence. The parties have also separated on various occasions only to return to their cohabitation.

[¶ 7] B.A.S. was born to this couple on June 8, 1994. The baby was stable at birth, but, developed jaundice and was required to remain at the hospital after mother's release. After the birth, mother only infrequently requested that the child be brought to her room and, after her release, mother and fa-

---

1. Because of the child's Native American heritage, he is covered by the provisions of the Indian Child Welfare Act (ICWA). *People in Interest of A.R.P.*, 519 N.W.2d 56, 60 (S.D.1994). However, it would appear all tribal notification re- quirements of the Act were complied with in this case and no issue over lack of compliance with any requirement of the Act has been raised in this appeal.

ther made few visits to see the child. This behavior eventually caused medical personnel to become concerned over a lack of bonding with the child and a referral was made to the state Department of Social Services (DSS).

[¶ 8] A DSS investigator visited mother and father's home. While it was clean, mother and father had made no preparations whatsoever for the arrival of a newborn infant. Mother and father both informed the investigator that they were schizophrenic and taking various medications. A subsequent contact with mother's sister revealed the history of domestic violence in the home, father's controlling influence over mother and the difficulties mother and father experienced with their previous child and their lack of bonding with that child. In the sister's view, neither mother nor father were capable of caring for a child.

[¶ 9] In the meantime, DSS was advised by the child's doctor that the child had fused sutures on the top of his head and would be needing surgery. Thus, on June 16, the child was placed in the protective custody of DSS and, eventually, the surgery was successfully completed. DSS filed an abuse and neglect petition on July 19, 1994. After adjudicatory and dispositional hearings and requests for open adoption[2] by mother and father, the trial court entered findings of fact, conclusions of law and orders terminating mother and father's parental rights, holding mother's motion for open adoption in abeyance and denying father's motion for an open adoption. However, the trial court's order on the open adoption issue did contain the following provisos:

> ORDERED, that all counsel in this matter may, in thirty days, submit to the Court for its review, proposed letters to be given to prospective adoptive parents of the minor child; and it is further
> ORDERED, that the Department of Social Services shall notify this Court when individuals are identified who have expressed a serious interest in adopting the minor child so that the Court may then provide these individuals with any and all information

deemed necessary to assist them in either agreeing to or declining an "open adoption" situation in this matter.

Father appeals.

## ISSUE 1

[¶ 10] **Is the evidence sufficient to sustain the trial court's finding that termination of father's parental rights is the least restrictive alternative?**

■ [¶ 11] Father contends there was not proof beyond a reasonable doubt that termination of his parental rights was the least restrictive alternative because a less restrictive alternative existed in placing the child with him subject to on-going monitoring by DSS.

> [C]hild custody proceedings involving the termination of parental rights to an Indian child are subject to specific minimum federal procedures and standards. The ICWA provides:

> > No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

> 25 U.S.C. § 1912(f). Thus, the burden of proof that must be shown is "evidence beyond a reasonable doubt." *Id.* The ICWA additionally requires the State to show that it made efforts to prevent the breakup of the Indian family. In this regard, the ICWA provides:

> > Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

---

2. "Open adoption" can be defined as, " 'a right to continued contact with Child after he is adopted' or in other words, post-adoption visita-

tion." *People in Interest of S.A.H.*, 537 N.W.2d 1, 6 (S.D.1995).

25 U.S.C. § 1912(d).

*A.R.P.*, 519 N.W.2d at 60 (citations omitted).

[¶ 12] With regard to these requirements, the trial court entered the following pertinent findings:

> The Court finds beyond a reasonable doubt that the Respondent father presents the following risk factors which will likely interfere with his parenting effectively: he has failed to establish a relationship with the minor child; his relationship with the Respondent mother is highly unstable and oftentimes has resulted in domestic violence; he continues to refuse treatment for his chemical dependency; he is intellectually low functioning and presents a lack of impulse control and good judgment; he has a lack of understanding of basic parenting skills; and he continues to drink and use illegal drugs.

#### XII.

The Court finds beyond a reasonable doubt that both parents suffer from mental illness which is but one contributing factor in their inability to perform essential parenting duties.

#### XIII.

The Court finds beyond a reasonable doubt that the Respondent parents are unable to care for the minor child on a long-term basis and have failed to show any commitment in working toward this goal.

#### XIV.

The Court finds beyond a reasonable doubt that serious physical or emotional damage would likely result if the minor child was placed with either of the Respondent parents.

#### XV.

The Court finds beyond a reasonable doubt that the Department of Social Services has made reasonable efforts to return legal and physical custody of the minor child to the Respondent parents; however, these efforts have been unsuccessful due to a lack of commitment on the part of the Respondent parents.

#### XVI.

The Court finds beyond a reasonable doubt that the Department of Social Services has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.

[¶ 13] These findings are reviewed under the clearly erroneous standard. *A.R.P., supra.* They are amply supported by the record. Between the time the child was taken into DSS custody in the summer of 1994 and October 1995 (almost a year and a half), DSS arranged some sixty-nine opportunities for mother and father to visit the child. Father attended only twenty-two of these visitations. A parenting instructor also attempted to work with mother and father for almost a year, scheduling half-hour parenting classes on a near-weekly basis. In a year's time, however, mother and father attended only twelve or thirteen parenting classes. By June 1995, the parenting instructor closed her involvement with the case because mother and father had not attended classes for several weeks.

[¶ 14] Despite father's protestations to the contrary, by the time the parenting classes ceased, neither he nor mother possessed basic parenting skills sufficient to care for the child in the absence of supervision. Neither parent could consistently prepare baby formula nor could they recognize if the child needed to be fed or when he was full. In one instance, father's solution to the child's hunger was to give him a bottle of water. In another incident, father played with the child and woke him up when he had specifically been instructed that the child needed to sleep. After the child had again fallen asleep, father woke him and changed his clothes for no apparent reason.

[¶ 15] Father also entered into a family service agreement requiring him to undergo chemical dependency and psychological evaluations. When these evaluations resulted in recommendations that father complete inpatient alcohol treatment, father adamantly

refused. In short, neither mother nor father did anything in a year's time reflecting a commitment to regaining custody of their child. Compounding mother and father's problems is the fact that the child is a special needs child who is delayed in certain motor skills.

[¶ 16] With specific regard to the requirements of the ICWA, an ICWA expert testified that, in her opinion, the child would suffer serious emotional or physical injury if returned to his parents' custody. This opinion was partially based on risk factors concerning father such as his failure to establish and maintain a relationship with the child, the instability of father's relationship with mother, the violence in the home, father's chemical dependency issues, and his deficient judgment and impulse control. The ICWA expert also pointed to father's lack of understanding of parenting skills and his difficulty in following or receiving directions from others. Based upon these deficiencies, the ICWA expert testified that the least restrictive alternative available in the disposition of the child was the termination of both mother and father's parental rights and the adoption of the child.

[¶ 17] The foregoing evidence overwhelmingly supports the trial court's findings as to the least restrictive alternative. Therefore, there is no clear error in the trial court's finding concerning the termination of father's parental rights as the least restrictive alternative commensurate with the best interests and welfare of the child.

## ISSUE 2

[¶ 18] **Did the trial court err in terminating father's parental rights because there was a less restrictive alternative in terminating parental rights with open adoption privileges granted to father?**

[¶ 19] Father's argument under this issue relies upon this Court's decision in *S.A.H.*, *supra* allowing the open adoption of children who have been adjudicated as abused or neglected.[3] Father submits this

---

**3.** This Court's decision in *S.A.H.*, *supra*, noted that our statutes did not specifically prohibit open adoptions in South Dakota. However, as of July 1, 1997, two different acts passed by the

decision requires courts in abuse or neglect cases to explore open adoption as a less restrictive alternative to a full termination of parental rights. As state submits, however, this argument is resolved by the fact that adoption *presupposes* the termination of parental rights. *See,* SDCL 25–6–17 (natural parents of adopted child have no rights over child); SDCL 26–8A–27 (on entry of dispositional decree terminating parental rights, the court shall vest DSS with custody and guardianship of child for purpose of placing child for adoption). Or, stated another way, parental rights over a child must be terminated before an adoption of the child can ensue. *Id. See also, e.g., E.H. v. M.H.,* 512 N.W.2d 148 (S.D.1994); *Matter of M.A.C.,* 512 N.W.2d 152 (S.D.1994). It follows that adoption (whether open or closed) cannot serve as an alternative to a termination of parental rights because it can only follow a termination of parental rights.

[¶ 20] In this instance, as discussed under the first issue, the involuntary termination of father's parental rights was well-supported by the record and evidence and must be affirmed. Open adoption of the child could offer no less restrictive alternative to the termination and, as in *S.A.H.*, the decision on open adoption must be separately reviewed.

## ISSUE 3

[¶ 21] **Did the trial court err in failing to enter a final judgment or order on father's motion for open adoption after the dispositional hearing?**

[¶ 22] At various stages of the dispositional phase, father's counsel attempted to raise the issue of open adoption. These attempts were repeatedly rebuffed by the trial court as premature because it had not yet made any decision as to whether or not to terminate parental rights. Once an order was entered terminating parental rights, father filed formal motions for an open adoption and for the appointment of an expert to evaluate the desirability of open adoption.

---

1997 Legislature prospectively disallow open adoptions. *See* 1997 S.D.Sess.L. ch. 153, § 1; 1997 S.D.Sess.L. ch. 161, § 1.

[¶ 23] A hearing was held on father's open adoption motions during which the trial court summarily denied the request for appointment of an expert. The court expressed its belief that any motion for open adoption was premature until potential adoptive parents could be located. However, the court did decide it would be willing to provide information on mother and father and their request for open adoption to potential adoptive parents and, in essence, leave the determination of open adoption in the potential parents' hands. It was for that reason that the trial court's order on the open adoption issue denied father's motion while permitting counsel to draft proposed letters to prospective adoptive parents and to provide those individuals with any and all information necessary to assist *"them"* in agreeing or declining an open adoption.

[¶ 24] Father essentially contends that the trial court's method of resolving the open adoption issue did not comport with this Court's decision in *S.A.H.* Father's argument holds merit. Just as in this case, the parents in *S.A.H.* moved for an open adoption after the trial court terminated their parental rights. *S.A.H.,* 537 N.W.2d at 6. The trial court denied the motion and the parents appealed in conjunction with the appeal of the termination. In its review, this Court recognized the concept of open adoption and outlined the following procedural guidelines. First, that the trial court has discretion to order open adoption and its determination is reviewed under the abuse of discretion standard. *S.A.H.,* 537 N.W.2d at 6. Second, the best interest of the child is the guiding force behind the determination. *Id.* Third, in order to grant an open adoption, the court must find by clear and convincing evidence that the child's best interests are served by open adoption. *Id.* at 7. In making this determination, the trial court must weigh:

1) the psychological need of the child to know his ancestral, religious, ethnic and cultural background; 2) the effect open adoption will have on the child's integration with his adoptive family; and 3) the effect open adoption will have on the pool of prospective adoptive parents.

*Id.* Fourth, if a trial court mandates open adoption, a guardian ad litem should be appointed to enforce the visitation order. *Id.* Fifth, the trial court may reconsider an open adoption at any time the child's best interests are jeopardized. *Id.*

[¶ 25] In this case, in contrast with *S.A.H.,* the record does not reflect that the trial court carefully considered arguments for and against open adoption. There are no findings of fact or conclusions of law in this regard. Such findings and a final determination should have been made at or near the time parental rights were terminated. Rather, the trial court repeatedly found arguments over the issue of open adoption premature because potential adoptive parents had not yet been found. Under the above procedures outlined in *S.A.H.,* however, it is clear this is not required.

[¶ 26] The record reflects that the trial court's primary concern with open adoption in this case was with whether potential adoptive parents would accept or reject an open adoption. In *S.A.H.* this Court specifically stated that, "[a]lthough the interests of adoptive parents should be considered, parental rights are secondary to the interests of the child." *S.A.H.,* 537 N.W.2d at 6. Clearly, the trial court's determination in this case leaving the question of open adoption in the hands of potential adoptive parents runs afoul of this charge. Only when a prospective adoptive placement is close at hand at the time of termination may consent be a useful factor. Moreover, placing this child's adoptive placement in suspense, disregards both federal and state laws mandating permanency planning for abused and neglected children. *See e.g.* 42 U.S.C. § 675(5)(C) (1994)(states to provide procedures assuring each child in foster care under supervision of state has dispositional hearing to determine child's future status no later than eighteen months after original placement). *Accord* 45 CFR § 1356.21(e). *See also* ARSD 67:14:31:59 (foster child in custody of department of social services must have dispositional hearing within 18 months from date of original foster care placement).

[¶ 27] We remand this case to the trial court to take evidence on the request for

open adoption and to enter forthwith a final determination on the issue. The court should consider: "1) the psychological need of the child to know his ancestral, religious, ethnic and cultural background; 2) the effect open adoption will have on the child's integration with his adoptive family; and 3) the effect open adoption will have on the pool of prospective adoptive parents." *S.A.H.*, 537 N.W.2d at 7. As always, the best interests of the child should be the foremost consideration, with a view to providing a safe, caring and permanent home. The trial court should enter findings of fact and conclusions of law on these factors supportive of its ultimate determination of the open adoption issue.

[¶ 28] Affirmed in part, reversed in part and remanded.

[¶ 29] MILLER, C.J., and SABERS, AMUNDSON, KONENKAMP and GILBERTSON, JJ., participating.

