#27535-rem-LSW

**2016 S.D. 44**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

The People of the State of South Dakota
in the Interest of A.B., Child, and
Concerning R.B. and T.B.E., Respondents.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBERT A. MANDEL
Judge

\* \* \* \*

DANA L. HANNA
Rapid City, South Dakota

Attorney for appellant
mother R.B.


MARTY J. JACKLEY
Attorney General

MICHAEL D. SHARP
WADE REIMERS
Special Assistant Attorneys General
Legal Division Department
  of Social Services
Pierre, South Dakota

Attorneys for appellee State of
South Dakota.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 21, 2016

OPINION FILED **05/18/16**

WILBUR, Justice

[¶1.]    Mother appeals the termination of her parental rights. She argues that the circuit court abused its discretion when it qualified the State's witness as an expert under the Indian Child Welfare Act (ICWA) in light of the recently-adopted Bureau of Indian Affairs guidelines interpreting ICWA. She also claims that the circuit court applied the wrong standard of proof when it terminated her parental rights, and that the State's expert failed to specifically opine that continued custody of the child with Mother would likely cause serious emotional or physical harm to the child. Lastly, Mother claims that the least restrictive alternative is to continue Mother's legal relationship with the child while Father retains full legal and physical custody. We remand.

## Background

[¶2.]    In April 2014, Mother contacted the Department of Social Services (DSS) because she was concerned that an adult male had sexually abused her daughter. DSS contacted law enforcement. During the investigation, Mother admitted that she used and sold methamphetamine. She also told law enforcement and DSS that she had left her daughter, A.B. (seven years old at the time), alone with the adult male so Mother could sell methamphetamine. Mother admitted that she routinely took A.B. with her to sell drugs.

[¶3.]    Ultimately, law enforcement did not find sufficient evidence to substantiate the alleged sexual abuse against A.B. But law enforcement took A.B. into emergency custody and placed her in the custody of DSS because of Mother's drug use and distribution. DSS substantiated Mother's neglect of A.B.

[¶4.] DSS began working with Mother in June 2014, and later began working with Father. Mother is an enrolled member of the Northern Arapaho Tribe. Father is an enrolled member of the Cheyenne River Sioux Tribe. Mother and Father were never married and did not live together. A.B. had at all times resided with Mother. Mother and A.B. lived a transient lifestyle due to Mother's use and distribution of methamphetamine. Father is employed full time and lives in Rapid City with his girlfriend and their two children.

[¶5.] In regard to Mother, DSS developed a case plan with a start date of August 2014. Mother and DSS identified desired outcomes—for Mother to be able to articulate a plan and execute a plan to protect A.B., for Mother to be able to demonstrate that her choices and words have a direct effect on A.B.'s safety, and for Mother to be able to identify dangerous people. DSS informed Mother that she needed to complete a chemical dependency evaluation and comply with the treatment recommendations, attend weekly visitation with A.B., provide clean urine screens for illegal substances, obtain and maintain a safe and stable home, engage in individual therapy, and be a sober participant in A.B.'s therapy.

[¶6.] Mother completed the required mental health evaluation. She disagreed with the recommendations and refused to comply. Mother tested positive for illegal substances each time DSS screened Mother's urine (May 23, 2014, June 28, 2014, October 10, 2014, October 21, 2014, and November 4, 2014). Mother underwent a chemical dependency evaluation. She stated that after the evaluation she began attending outpatient treatment. She claimed she could not complete the treatment due to her arrest on December 3, 2014, for failing to appear for a 24/7

Program screening. Mother also claimed that she attempted to participate in a treatment program at the South Dakota Women's Prison, but could not because of her transfer to the Pennington County Jail.

[¶7.] Mother participated in weekly visitations with A.B. while incarcerated. When not incarcerated, Mother attended some, but not all, scheduled visits. Mother was incarcerated multiple times during DSS's involvement. The first incarceration occurred in July 2014 and lasted 20 days. The second occurred in September 2014 and lasted between two and three weeks. The third occurred in December 2014 and lasted 180 days. The fourth occurred less than twenty-four hours after Mother's release from custody on all matters. Mother was arrested for driving under the influence, driving with a suspended license, operating a motor vehicle with substitute license plates, operating a motor vehicle without insurance, and driving without headlights. Mother remained incarcerated up to and through the time of the dispositional hearing.

[¶8.] While incarcerated, DSS attempted to arrange treatment options for Mother. The only option in the Pennington County Jail until Mother's release date neared was Alcoholics Anonymous. On April 29, 2015, Mother completed a progress evaluation with DSS. The report revealed that Mother had not made progress toward the outcomes identified by DSS to allow Mother to reunite with A.B. DSS sent Mother educational material related to addiction and parenting. DSS also sent Mother A.B.'s medical and school records. DSS included postage, pre-paid envelopes for Mother to write letters to A.B.

[¶9.] Throughout DSS's involvement, DSS performed numerous kinship searches to limit A.B.'s time in foster care. A.B. is an enrolled member of the Northern Arapaho Tribe. DSS notified the Northern Arapaho Tribe that A.B. was in DSS custody. DSS spoke with a representative of the Tribe regarding upcoming court hearings and A.B.'s placement. DSS requested assistance from both the Northern Arapaho Tribe and the Cheyenne River Sioux Tribe for placement options for A.B. with Mother's or Father's relatives. Mother's maternal aunt requested that she be considered as a placement option. DSS approved Aunt for placement. A.B. remained with Aunt until DSS approved Father for placement.

[¶10.] The circuit court held a final dispositional hearing on June 29, 2015. At the time of the dispositional hearing, DSS concluded that Father had demonstrated his ability to safely and sufficiently provide for A.B. and sought an order giving Father permanent physical and legal custody of A.B. In regard to Mother, DSS sought to terminate her parental rights. At the time, Mother was still incarcerated. She did not oppose an order giving Father permanent physical and legal custody of A.B. However, she contested the termination of her parental rights. She requested that the court allow her to maintain a legal and personal relationship with A.B.

[¶11.] At the dispositional hearing, the DSS caseworker, Mary Van Den Hemel, testified about the efforts DSS provided and about Mother's actions throughout DSS's involvement. Van Den Hemel opined that Mother did not make progress in overcoming her addictions and that termination of Mother's parental rights would be in A.B.'s best interest. According to Van Den Hemel, leaving intact

Mother's legal rights to A.B. would leave A.B. vulnerable to being exposed to the use and sale of methamphetamine if something were to happen to Father.

[¶12.] The State also called Luke Yellow Robe as an ICWA expert. Yellow Robe is a member of the Rosebud Sioux Tribe. He testified that he is familiar with the Northern Arapaho Tribe and has been to the Tribe's reservation—the Wind River Reservation. According to Yellow Robe, the Northern Arapaho, Northern Cheyenne, and Lakota Sioux all inhabited the Black Hills and the childrearing practices of these tribes are similarly based on the concept of the cradleboard. Yellow Robe explained that these tribes "recognize that the child was sacred. And if a child is going to be sacred, traditionally speaking, the tribe is going to come together as a community, as a whole, to be all a part of raising that child so that child eventually, based on a sense of identity, has a clear and concise, you know, plan in place to be able to become a productive member of the tribe and a representative of, you know, their gender to the point of that area of specialty[.]"

[¶13.] Yellow Robe also testified that he is familiar with the Northern Arapaho Tribe's childrearing practices. He explained,

> We just had a case in Minnehaha County that actually took five full days, about six hours every day in court, one case. The father was Northern Arapaho and the mom was Hopi. And through that particular case, there were a couple of conference calls that I was part of through the Minnehaha County State's Attorney's Office and the family service specialist talking to the ICWA representatives of the Northern Arapaho [T]ribe. . . . [I]t just was an opportunity once again for me to visit with them and go over some of the child-rearing practices, some of the questions that I had.

He continued to explain the basis for his knowledge about the Tribe's childrearing practices.

> Well, I'll state this, first. That I was hired on two different occasions to work with the [T]ribe. Once was - - I was hired by the Attorney General's Office out of the State of Wyoming in Cheyenne to come and be part of a healing ceremony, based on all the suicide that they were having to deal with, and so I was one of the consultants that not only presented at the conference, but, of course, participated in some of the ceremonies over at St. Stephens, which is the old Catholic Mission there on Wind River Reservation. Gave me the opportunity to work with spiritual leaders, to meet tribal representatives, and of course representatives with a number of child care organizations that were all there to assist in this ceremony.
>
> Then I went back on some follow-up through the Tribal Law and Policy Institute, when Diane Payne out of the Anchorage office called and said, "We want you to come back and spend time and we'll do some follow-up and continue to work with some of the representatives that are still around." So I have had hands-on experience working with the people.

Yellow Robe reiterated that he had discussions with spiritual leaders and ICWA representatives with the Wind River Reservation. Over Mother's objection, the circuit court held that Yellow Robe qualified as an ICWA expert in this case. Yellow Robe opined that termination of Mother's parental rights is in A.B.'s best interest. He explained that continued custody with Mother would be "injurious."

[¶14.] After the hearing, the court issued an oral ruling terminating Mother's parental rights. The court remarked that this is "a very close decision of the [c]ourt." But, in the court's view, "it just comes down to the fact that the best interests of the child do outweigh the issue of accepting [Mother's request for continued legal custody] as the least restrictive alternative." In its written findings of fact and conclusions of law and order, the court found beyond a reasonable doubt that DSS made reasonable efforts to return A.B. to Mother's home. It found beyond a reasonable doubt that the conditions that led to A.B.'s removal continued to exist

and that there is little likelihood that the conditions would be remedied in the near future so A.B. could be reunited with Mother. It held by clear and convincing evidence that serious emotional or physical damage would likely result if Mother retained legal care or custody of A.B. It concluded beyond a reasonable doubt that the least restrictive alternative commensurate with A.B.'s best interest is to terminate Mother's parental rights and place A.B. in the full physical and legal custody of Father.

[¶15.] Mother appeals, and we restate her issues as follows:

1. Whether the circuit court abused its discretion when it qualified Luke Yellow Robe as an expert under 25 U.S.C. § 1912(f).

2. Whether the circuit court erred because it applied the clear and convincing standard of proof when 25 U.S.C. § 1912(f) specifically requires evidence beyond a reasonable doubt to terminate Mother's parental rights.

3. Whether the evidence was legally sufficient to support termination of Mother's parental rights.

4. Whether termination of Mother's parental rights was the least restrictive alternative.

**Standard of Review**

[¶16.] It is undisputed that ICWA applies to these proceedings. Under 25 U.S.C. § 1912(f), the circuit court cannot terminate Mother's parental rights "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *See In re J.I.H.*, 2009 S.D. 52, ¶ 17, 768 N.W.2d 168, 172. The court must also find—by clear and convincing evidence—that termination

is the least restrictive alternative commensurate with the best interest of the child. *Id.* ¶¶ 21-22. We review a circuit court's factual findings under the clearly erroneous standard of review. *In re B.S.*, 1997 S.D. 86, ¶ 13, 566 N.W.2d 446, 449. "The standard of review for a trial court's qualification of an expert witness is abuse of discretion." *In re O.S.*, 2005 S.D. 86, ¶ 7, 701 N.W.2d 421, 424 (citing *In re D.M.*, 2003 S.D. 49, ¶ 19, 661 N.W.2d 768, 773).

### Analysis

#### 1.     Expert's Qualifications

[¶17.]     Mother argues that the circuit court abused its discretion when it found that the State presented sufficient evidence to support that Yellow Robe is qualified to give expert testimony in this case. Mother directs this Court to the recently adopted *Bureau of Indian Affair Guidelines for State Courts and Agencies in Indian Child Custody Proceedings* (2015 BIA Guidelines), Federal Register, Vol. 80, No. 37, 10146-10159 (February 2015). Relying on the 2015 BIA Guidelines, Mother insists that Yellow Robe must have a specialized knowledge of the culture and custom of A.B.'s tribe—the Northern Arapaho Tribe. She then argues that the evidence is insufficient to support the circuit court's finding that Yellow Robe possessed the requisite specialized knowledge.

[¶18.]     The BIA Guidelines, although helpful, "do not have binding legislative effect and have never been formally adopted by this Court." *In re M.H.*, 2005 S.D. 4, ¶ 10, 691 N.W.2d 622, 625.* *See Merrill v. Altman*, 2011 S.D. 94, ¶ 19, 807 N.W.2d

---

*     The 1979 BIA Guidelines identified three possible expert witnesses.

(continued . . .)

─────────────────

(. . . continued)

(i)      A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii)      A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii)      A professional person having substantial education and experience in the area of his or her specialty.

*In re S.D.*, 402 N.W.2d 346, 349-50 (S.D. 1987) (quoting 44 Fed. Reg. 67584, 67595 (Nov. 26, 1979)). By comparison, the 2015 BIA Guidelines provide:

(a) A qualified expert witness should have specific knowledge of the Indian tribe's culture and customs.

(b) Persons with the following characteristics, in descending order, are presumed to meet the requirements for a qualified expert witness:

1. A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

2. A member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on their knowledge of the delivery of child and family services to Indians and the Indian child's tribe.

3. A layperson who is recognized by the Indian child's tribe as having substantial experience in the delivery of child and family services to Indians, and knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

4. A professional person having substantial education and experience in the area of his or her specialty who can demonstrate knowledge of the prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

*Kent K. v. Dep't of Health & Soc. Servs.*, No. S-15708, 2016 WL 483254 (Alaska Feb. 3, 2016).

821, 825; *In re A.L.*, 442 N.W.2d 233, 236 (S.D. 1989). And, as Justice Zinter noted in his concurrence in result in *O.S.*, there is "nothing in the text of ICWA" that requires that the expert have "specialized knowledge of the child's tribe." 2005 S.D. 86, ¶ 24 n.6, 701 N.W.2d at 429 n.6 (Zinter, J., concurring in result).

[¶19.]    Nonetheless, "[o]ne of the problems the ICWA sought to correct was the failure of welfare workers to understand Indian culture and practices concerning the raising of children." *M.H.*, 2005 S.D. 4, ¶ 10, 691 N.W.2d at 625 (quoting *In re D.S.*, 577 N.E.2d 572, 576 (Ind. 1991)). Therefore, we require that experts "possess more than simply substantial education and experience in the area of their specialty. Rather, they should have expertise in, and substantial knowledge of, Native American families and their childrearing practices." *Id.* (quoting *In re K.H.*, 981 P.2d 1190, 1193 (Mont. 1999)). This is because the "underlying task of the expert's testimony in ICWA cases is to provide the court with an understanding of the social and cultural aspects of Native American families and the childrearing practices of the child's tribe." *O.S.*, 2005 S.D. 86, ¶ 8, 701 N.W.2d at 425.

[¶20.]    Here, Mother does not claim that Yellow Robe lacked a sufficient understanding of Native American culture. She also does not assert that Yellow Robe inaccurately described the Northern Arapaho Tribe's culture and childrearing practices. Instead, she claims on appeal that the State did not present *sufficient foundational evidence* to show that Yellow Robe possessed the requisite specialized knowledge under the 2015 BIA Guidelines. She argues that "[i]t is of enormous significance that Mr. Yellow Robe admitted in his testimony that the elders of the Northern Arapaho Tribe, who are surely the most competent experts on questions of

tribal traditions and practices, would not recognize him as an expert in the childrearing practices of the Northern Arapaho. He further admitted that he had never studied the childrearing practices of the Northern Arapaho in any educational setting or read any books on that subject."

[¶21.] From our review of the evidence, the State presented sufficient foundational evidence of Yellow Robe's expertise as an ICWA expert under either the 1979 or 2015 BIA Guidelines. Yellow Robe's understanding of the Native American culture and the Northern Arapaho Tribe's childrearing practices allowed Yellow Robe "to provide the court with an understanding of the social and cultural aspects of Native American families and the childrearing practices of the child's tribe." *See O.S.*, 2005 S.D. 86, ¶ 8, 701 N.W.2d at 425. The circuit court did not abuse its discretion when it found that Yellow Robe had substantial knowledge in Indian culture and childrearing practices sufficient to testify in this case.

## 2. Standard of Proof

[¶22.] Mother argues that the circuit court applied the wrong standard of proof when it terminated her parental rights. The court found "by *clear and convincing evidence* that serious emotional and/or physical damage would likely result were the minor child placed in the legal care or custody of Respondent mother." (Emphasis added.) It is undisputed that 25 U.S.C. § 1912(f) requires evidence *beyond a reasonable doubt*. According to Mother, the fact the court identified an incorrect legal standard means the court's ruling is insufficient as a matter of law and reversal is necessary.

[¶23.] The State responds that the circuit court "was undoubtedly aware" of the standard of proof under 25 U.S.C. § 1912(f). The State also avers that Mother waived the issue because she did not object to the State's proposed findings of fact and conclusions of law or propose her own findings and conclusions. The State alternatively argues that despite the improper standard identified by the court, the mistake does not constitute reversible error because a review of the evidence supports that the requirements of 25 U.S.C. § 1912(f) were met.

[¶24.] From our review of the court's findings of fact and conclusions of law, the court's failure to identify the proper standard of proof is problematic. Indeed, we review the circuit court's factual findings for clear error. And, here, Mother does not identify how the court clearly erred. Moreover, on those facts, the circuit court concluded that evidence existed *beyond a reasonable doubt* that the conditions that led to A.B.'s "removal continue to exist and there is little likelihood that those conditions will be remedied in the near future so that the child can be reunited with the Respondent mother." The court also concluded that evidence existed *beyond a reasonable doubt* that "the best interest of the minor child outweighs" termination of Mother's parental rights. But the court did not make the requisite inquiry whether the evidence existed *beyond a reasonable doubt* that Mother's continued custody of A.B. would likely result in serious emotional or physical harm. The court erred when it terminated Mother's parental rights without conducting this necessary examination utilizing the proper standard of proof. We, therefore, remand for the circuit court to determine—on the existing record—whether

evidence exists beyond a reasonable doubt that serious emotional and/or physical damage would likely result were A.B. placed in the legal care or custody of Mother.

### 3. Legally Sufficient Evidence to Support Termination

[¶25.] Mother contends that Yellow Robe did not offer an expert opinion that continued custody with Mother would likely result in serious physical or emotional damage to A.B. He merely said continued custody could be "injurious." In Mother's view, without an expert opinion that serious emotional or physical damage would result, the evidence is legally insufficient to terminate her parental rights under 25 U.S.C. § 1912(f).

[¶26.] Mother is incorrect. The language of 25 U.S.C. § 1912(f) does not mandate that an expert specifically state that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Rather, 25 U.S.C. § 1912(f) directs that a circuit court may not order "termination of parental rights" unless *the court* determines that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *Id.* And the court's determination *must* be "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses[.]" *Id.* Thus, the fact Yellow Robe used the word "injurious" does not mean the evidence is legally insufficient to support termination. Yellow Robe also opined that Mother's continued custody of A.B. would not be in A.B.'s best interest because Mother continues to face addiction problems and has not addressed those problems. To Yellow Robe, threats to A.B.'s safety continue to exist. Mother does not dispute that she continues to face

addiction to methamphetamine and, that because of her addiction, Mother has subjected A.B. to the world of drug sales. During DSS's involvement, Mother did not make progress in overcoming her addiction. She also faced continued incarcerations, which evince a likelihood that Mother's continued custody of A.B. would expose A.B. to serious emotional or physical damage.

### 4.  Least Restrictive Alternative

[¶27.]  Mother contends that the least restrictive alternative would be to give permanent physical custody and a permanent guardianship of A.B. to Father. Terming the alternative as a "guardianship" is inaccurate. Father is a biological parent of A.B., not a guardian as contemplated under SDCL Title 25. Nonetheless, the crux of Mother's argument is that the circuit court abused its discretion when it terminated her parental rights. Mother did not seek custody of A.B.—she wanted her legal rights to be intact so she could continue a legal and personal relationship with A.B.

[¶28.]  "Parental rights may be terminated if it is in the best interests of the child and is also the least restrictive alternative available." *In re L.S.*, 2012 S.D. 22, ¶ 12, 812 N.W.2d 505, 508 (quoting *In re E.L.*, 2005 S.D. 124, ¶ 10, 707 N.W.2d 841, 845). Under SDCL 26-8A-27, the court must find, by clear and convincing evidence, that termination is the least restrictive alternative "commensurate with the best interests of the child with due regard for the rights of the parents, the public and the state[.]" "Our standard of review is 'whether the trial court's ultimate finding— that clear and convincing evidence indicated termination was the least restrictive alternative commensurate with the child's best interests—was clearly erroneous.'"

*In re L.S.*, 2006 S.D. 76, ¶ 36, 721 N.W.2d 91, 94 (quoting *In re S.A.*, 2005 S.D. 120, ¶ 21, 708 N.W.2d 673, 680). "We are acutely aware that termination of parental rights is a drastic, final step that should be exercised with great caution." *In re B.E.*, 287 N.W.2d 91, 95 (S.D. 1979). In exercising that caution, a court must view the best interest of the child from the child's perspective, not the parent's perspective. *In re P.S.E.*, 2012 S.D. 49, ¶ 33, 816 N.W.2d 110, 119.

[¶29.]     If the court determines on remand that evidence exists beyond a reasonable doubt that Mother's continued custody of A.B. would likely result in serious emotional or physical damage to A.B., the court's decision that A.B.'s best interest justified termination need not be re-decided. Although Mother wants to retain her parental rights to A.B., only so she may retain a relationship with A.B., Mother's continued legal rights to A.B. leaves A.B. without permanency or stability. *See In re C.L.*, 397 N.W.2d 81, 85 (S.D. 1986) ("The best interests of the children require that some certitude and stability enter their lives."). The well-being and welfare of A.B. necessitates her protection from being exposed to her Mother's chaotic lifestyle in and out of jail and around drug users and distributors. *See In re S.H.E.*, 2012 S.D. 88, ¶ 33, 824 N.W.2d 420, 429.

[¶30.]     Remanded.

[¶31.]     GILBERTSON, Chief Justice, and ZINTER, Justice, concur.

[¶32.]     SEVERSON, Justice, concurs specially.

[¶33.]     KERN, Justice, deeming herself disqualified, did not participate.

#27535

SEVERSON, Justice (concurring specially.)

[¶34.] The circuit court in this case found many of the facts *beyond a reasonable doubt* where that was not the correct standard of proof and failed to find certain facts *beyond a reasonable doubt* where applying that high standard is required. This may indicate that confusion exists on the applicable standards of proof in abuse or neglect proceedings, including those where ICWA applies. I write specially to clarify the standards of proof by which the court must issue certain findings.

[¶35.] ICWA does not replace South Dakota statutes and case law addressing abused or neglected children but adds an additional dimension when child custody is an issue for an Indian child. Regardless of the applicability of ICWA, a court must determine whether a child is abused or neglected. The "State must prove by clear and convincing evidence that a child is dependent and neglected." *In re J.A.H.*, 502 N.W.2d 120, 123 (S.D. 1993). *See* SDCL 26-8A-27.

[¶36.] In certain cases, ICWA applies to the custody decisions that a court is making. *See* 25 U.S.C. § Ch. 21. If a court is placing Indian children in foster care, 25 U.S.C. § 1912(e) applies. It provides: "No foster care placement may be ordered in such proceedings in the absence of a determination, supported *by clear and convincing evidence*, including testimony of qualified witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e) (emphasis added).

[¶37.] If a court subsequently terminates parental rights at a final dispositional hearing, 25 U.S.C. § 1912(f) applies. Subsection (f) does not allow

termination of parental rights absent "a determination, supported by evidence *beyond a reasonable doubt*, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

[¶38.]    SDCL 26-8A-21 requires *reasonable efforts* by DSS "to make it possible for the child to return to the home of the child's parents, guardian, or custodian." However, if ICWA applies, then DSS must make *active efforts*.  ICWA provides:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d) (emphasis added).  Subsection (d) does not set forth that the court must be satisfied *beyond a reasonable doubt*.  However, this Court has determined that the same burden in subsection (f) should apply to a finding of active efforts to provide remedial and rehabilitative efforts.  *See In re S.R.*, 323 N.W.2d 885, 887 (S.D. 1982) ("[W]e assume that the same burden required to prove serious emotional or physical harm under § 1912(f), beyond a reasonable doubt, would also be required to prove active efforts by the party seeking termination."); *In re P.S.E*, 2012 S.D. 49, ¶ 22, 816 N.W.2d 110, 117 ("We . . . hold that the 'active efforts' requirement of § 1912(d) imposes a higher standard than the 'reasonable efforts' of SDCL 26-8A-21.").  Therefore, the court must find *beyond a reasonable doubt* that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

[¶39.] In all cases, our state law further requires that, prior to termination of parental rights, the court find termination to be the least restrictive alternative commensurate with the best interests of the child with due regard for the rights of the parents. SDCL 26-8A-27 provides:

> On completion of a final dispositional hearing regarding a child adjudicated to be abused or neglected, the court may enter a final decree of disposition terminating all parental rights of one or both parents of the child if the court finds, by *clear and convincing evidence*, that *the least restrictive alternative* available commensurate with the best interests of the child with due regard for the rights of the parents, the public and the state so requires.

(Emphasis added.)

[¶40.] Therefore, I concur in the opinion of the Court but write to address the standards of proof for abuse and neglect proceedings, including those cases where the Indian Child Welfare Act is applicable.